**UNITED STATES of America,
Appellee,**

v.

**Michael Joseph MAXEY, Appellant.**

**No. 758, Docket 73–1770.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 14, 1974.

Decided May 28, 1974.

Emanuel A. Moore, Asst. U. S. Atty., Brooklyn, N. Y. (Edward John Boyd V, U. S. Atty. E. D. of N. Y., and L. Kevin Sheridan, Asst. U. S. Atty., Brooklyn, N. Y., on the brief), for appellee.

Phylis Skloot Bamberger, New York City (William J. Gallagher, The Legal Aid Society, Federal Defender Services Unit, New York City, on the brief), for appellant.

Before MEDINA, MANSFIELD and OAKES, Circuit Judges.

MEDINA, Circuit Judge:

This case involves another armed bank robbery in Suffolk County on Long Island, New York. This robbery occurred at 10:20 A.M. on March 24, 1972 and the 3 robbers, each of whom carried a fully-loaded hand gun, made off with $11,934 in cash, taken from the Franklin National Bank in Brentwood. A fourth member of the team of robbers was in an automobile a short distance from the bank and the 3 men who actually robbed the bank drove off in a black 1966 Ford stolen the day before in New York City for the purpose of the contemplated robbery, and they abandoned the stolen Ford and switched to the other car that was waiting for them. They then drove to the home of one of the robbers who lived in the vicinity, and the stolen cash was distributed. The four men in this team of professional bank robbers were McCabe, Maxey, Santillo and Russo. McCabe was arrested on September 14, 1972. He promptly confessed, testified before the Grand Jury, and, after pleading guilty to various crimes that we shall discuss later, he appeared as the principal government witness at the trial of Maxey, which resulted in the judgment of conviction from which this appeal is taken. At the time of the trial Russo and Santillo were fugitives from justice.

The jury found Maxey guilty of armed bank robbery in violation of 18 U.S.C., Section 2113(d) and of conspiracy. It thus became unnecessary to pass upon a lesser charge [18 U.S.C., Section 2113 (a)] in a separate count of the indictment, in accordance with the instructions of the trial judge. Maxey was sentenced to 20 years' imprisonment for armed bank robbery, and five years' imprisonment for conspiracy, the terms to run concurrently. His bail was increased to $250,000 and he has remained in custody.

Maxey seeks reversal and a new trial claiming: (1) that his Sixth Amendment right to trial counsel was violated be- cause Chief Judge Mishler refused his request for an adjournment of the trial to give his recently retained counsel an opportunity to prepare for trial; and (2) that the government had not disclosed the full colloquy between Chief Judge Mishler and McCabe and his counsel at the time of his pleas of guilty, thus depriving Maxey's retained counsel of knowledge of the full benefits received by McCabe. It is said that such a disclosure was required for purposes of cross-examination. We find no merit in either of these contentions and affirm the judgment appealed from.

With respect to the insistence by Chief Judge Mishler that the trial commence on March 12, 1973, it is necessary to understand the full course of events. We have read every page of this long record and have examined the exhibits.

I

*Chronological Sequence of Events*

On October 25, 1972 Chief Judge Mishler entered a plea of not guilty on Maxey's behalf and appointed Maurice Brill, Esq., as counsel. Mr. Brill is a very competent lawyer, with a wide experience in the trial of criminal cases. There was nothing to prevent him from at once making such investigation of the facts and such preparation for trial as conferences with Maxey would indicate should be done. We have been unable to discern what there was to investigate or what special preparations for trial the circumstances of the case required other than with respect to an alleged alibi. Maxey and his wife claimed that on the very morning of the bank robbery, Friday, March 24, 1972, they went to see Probation Officer Amato but did not find him, and that they left a telephone message to say they wanted to see him. This was supposed to be for the purpose of getting his written permission to go by plane to California. We shall later find that Mr. Amato was called as a defense witness and he testified that his records noted every attempt to see him and every telephone call and that there was no reference in his records,

which he produced, to show any such visit or any such call. Mr. Amato did recall a visit with Mrs. Maxey on March 23, the day before the robbery, in which she said they wanted to go to California but did not have the money to pay the plane fare, and another visit with Mr. and Mrs. Maxey on Monday, March 27, 1972, shortly after the robbery, at which they told him they now had the money to go to California and he signed the written approval they needed and had requested. He further testified that neither of them said on March 27 anything about trying to see him or phoning to him on March 24. It also came out in the testimony of Mr. Amato that Mr. Brill had interrogated him about the same matter in January, 1973 and that he had told Mr. Brill the same things he had testified to. Of course, the investigation and preparation for trial by assigned counsel Brill could not have included interviewing Russo and Santillo, other participants in the robbery of the Brentwood bank on March 24, 1972, as they were fugitives from justice.

The next thing that happened was at 10:00 A.M. on February 14, 1973 when McCabe pleaded guilty to a superseding information charging him with the crime of bank larceny under 18 U.S.C., Section 2113(b). This was the stealing of the same $11,934 from the Franklin National Bank in Brentwood on March 24, 1972 alleged in the indictment before us. Chief Judge Mishler explained everything and McCabe said he really robbed the bank on that day with Maxey, Santillo and Russo, giving many details. All this took place in a public courtroom. There was no concealment of any kind from Maxey, from Maxey's counsel or from anyone else.

As to the making of a deal, Chief Judge Mishler asked McCabe the following questions and he made the following answers:

The Court: Have any promises of any kind, including any promise or suggestion as to what sentence will be imposed on you been made by your lawyer, the United States Attorney, the Court or anyone else to induce you to plead guilty?

Defendant McCabe: No, your Honor.

The Court: Has your lawyer expressed an opinion as to what sentence will be imposed?

Defendant McCabe: No, your Honor.

The Court: Did he, in effect, say you'll get probation or you'll get five years or you'll get seven years?

Defendant McCabe: No, your Honor.

The Court: Have you been threatened or coerced into pleading guilty?

Defendant McCabe: No, your Honor.

The Court: Are you pleading guilty voluntarily and of your own free will because you are guilty and for no other reason?

Defendant McCabe: Yes, your Honor.

The Court: Have you discussed your plea of guilty fully with your attorney?

Defendant McCabe: Yes, your Honor.

The Court: Do you know the maximum sentence which may be imposed for this crime is? (sic)

Defendant McCabe: Yes, your Honor.

The Court: What is it?

Defendant McCabe: Ten years.

The Court: The maximum sentence which may be imposed is a fine of $5,000 and a prison term of ten years; you understand that?

Defendant McCabe: Yes, your Honor.

Then the trial court turned to another indictment, 72 CR 1167. This indictment charged the same team, composed of McCabe, Maxey, Santillo and Russo with the armed robbery of the University Branch of the Hempstead Bank of $3,412.72 on March 14, 1972. McCabe withdrew his plea of not guilty, pleaded guilty to the Conspiracy Count, explained how

the four robbed the bank with Maxey going into the bank covering the employees with a loaded revolver, and how McCabe vaulted over the counter and scooped up the money just as he had done in the case of the robbery of the Brentwood bank on March 24, 1972. There were questions and answers similar to those above quoted about no promises, suggestions or expressions of opinion about what sentence would be imposed. Chief Judge Mishler found there was a factual basis for the plea of guilty to the Conspiracy Count and he accepted it.

Then the following occurred:

Mr. Moore: I have a statement for the record that at the time of sentence on these two cases, the Government will move to dismiss and I had told Mr. Tomi that Counts One and Two of Indictment No. 72 CR 1167 and on the other case, your Honor, the Government will move to dismiss as to the defendant Arthur Robert McCabe.

The Government would also move to dismiss at the time of sentence the indictment No. 72 CR 98 as to Arthur Robert McCabe as well as 72 CR 1166, as to Robert Arthur McCabe.

I would state for the record that although the Government has other cases against Mr. McCabe, there are about three other cases which we could indict him for, I have authority to represent the (sic) the Government will not proceed along those lines.

This is the part that is alleged to have been suppressed.

As Mr. Brill was present in the courtroom at the time of the above-quoted colloquy, it is likely that Maxey heard about McCabe's pleas of guilty and had a pretty good idea of what was coming for him. In any event, Chief Judge Mishler on the same February 14, 1973 said he was ready to go ahead with the trial of Maxey. Nobody was ready. The possibility of trying the case at once had been already discussed the day before between the prosecutor and assigned counsel Brill who, of all things, spoke about the government producing Russo to help Maxey

as a witness. Everybody knew, of course, that Russo was a fugitive. This gives us just a hint of what was coming.

So, after the pleas by McCabe on February 14, 1973, assigned counsel Brill was also present in court when Chief Judge Mishler said he was ready to go ahead with the trial of Maxey. He had been discussing matters with his client Maxey. Predictably, Maxey had told assigned counsel Brill that he did not want him any more "despite the fact that he told me he appreciates what I've done for him up until this time." Maxey suddenly wanted to change lawyers and retain new counsel. Maxey told Chief Judge Mishler that the effort to retain private counsel had been going on for over a week. Mrs. Maxey said, "I just got here last week," Maxey said, "this is no reflection on Mr. Brill" but Mr. Brill had said that while "he feels I'm innocent, * * * he can't prove my innocence." This sounds like a reflection of the prior investigation by Mr. Brill of the alleged alibi and Probation Officer Amato.

Maxey had been in prison since October. There had already been plenty of time to prepare for trial and that is what Mr. Brill had been doing. But Maxey said his new retained counsel would need more time. There was more talk of the government producing Russo. It would have to be a very stupid person not to realize what Maxey was up to. The upshot of the long colloquy, in which Mr. Brill fought manfully for Maxey, was that Chief Judge Mishler asked Maxey how much time he wanted. His reply was that one month would be sufficient to get an attorney and arrange for his defense. So Chief Judge Mishler gave him the month and set the trial peremptorily for March 12, to make sure that Maxey would not complain that he didn't have adequate time to arrange for his defense.

Mr. Brill wanted to be relieved but the judge said "no," it might be necessary for Mr. Brill to try the case, or, "if Maxey decides he would like to try it himself, you'll sit by." The judge's final

word was that they must not hire any lawyer who will come in on March 12th and say he needs more time to prepare for the trial.

But, predictably, that is precisely what happened. All the interested parties were in court on March 12. Chief Judge Mishler was there with a panel of prospective jurors at hand. Maxey, Mrs. Maxey and Mr. Brill were there. Also Hyman Dechter, Esq., to whom Mrs. Maxey had given a small retainer on the previous Friday, March 9. Chief Judge Mishler immediately asked Mr. Dechter if he knew that he had told Mr. and Mrs. Maxey, "Don't retain any attorney who cannot start this trial on Monday, March 12th, at ten A.M." Retained counsel did not answer this question, perhaps because Mrs. Maxey had told him nothing about this admonition. So Mr. Dechter asked for at least a month's postponement. This motion was promptly denied and the fur began to fly.

At first retained counsel said, "I stand mute," but he was soon complaining bitterly. He said the ruling was unconstitutional and he wound up saying that he was being intimidated and he asked Chief Judge Mishler to disqualify himself. Maxey then got into the colloquy and accused the judge of "railroading" him. He said the judge might as well go ahead and sentence him at once. There were various other protests by retained counsel and Maxey throughout the trial to the effect that he was being rushed into a trial for a serious offense without being given any opportunity to prepare for trial. Naturally, nothing was said about the prior proceedings, the work done by Mr. Brill or the giving to Maxey of the month's delay he said he needed to get a new lawyer and go to trial.

■ The idea that this whole business was Maxey's prearranged strategy to put off the day of reckoning never seems to have occurred to appellate counsel, who would have us believe that it was an "outrage" not to take the various statements about unpreparedness at face value and grant the requested adjournment,

which would have meant putting the case over to June. Chief Judge Mishler stated in no uncertain terms that the protests and applications for delay were all part and parcel of Maxey's strategy to put off the evil day as long as he could and, on this record, we do not see how we would or could be justified in setting aside this finding as clearly erroneous.

The upshot of all this was that Maxey said he "dismissed" both of the lawyers and he wanted to go to trial "by myself," although the judge advised Maxey against doing this. Mr. Brill turned his file over to Maxey, except for his own personal papers, and was excused, but was told not to go far away as Maxey might "change his mind." The judge also asked Mr. Dechter to stay. He replied, "I don't know if I am staying." After some more talk about being intimidated, and not knowing whether he would or would not, Mr. Dechter did stay.

Retained counsel was of some assistance to Maxey on the selection of the jury, Maxey decided to waive his opening to the jury, and the prosecutor proceeded to call witnesses in support of the government's case. Maxey and his retained counsel sat together and all was peaceful during the testimony of three bank employees who had witnessed the robbery. Retained counsel cross-examined them. During the entire direct examination of McCabe, the next government witness, retained counsel made objections and performed the ordinary duties of defense counsel. At the close of the first day of trial a rap sheet and a mass of 18 U.D.C. Section 3500 material was turned over to retained counsel. Chief Judge Mishler told him, "You'd better take that entire file home with you, Mr. Dechter." That assigned counsel made good use of this material overnight preparing for cross-examination of McCabe will soon become clear. Chief Judge Mishler also ordered the reporter to provide Mr. Dechter with a daily copy of the transcript, and this was done. But, at the opening of court on the second day of the trial there were more vigorous protests about unprepar-

edness. There was another motion for an adjournment, which was denied. During all these colloquies, also during the making of motions, objections and discussions generally during the trial, the jury was excused.

When this particular colloquy was over, retained counsel said, "I stand mute," and he advised Maxey to do the same. Had retained counsel and Maxey remained mute from the beginning, or had they remained mute after McCabe was recalled, we would have had an entirely different record about which we find no occasion to comment.

McCabe was recalled and gave further testimony. Retained counsel refused to cross-examine him. Retained counsel also stood mute during the testimony of Brian Abernathy, who said he had driven Maxey, Russo, Santillo and McCabe down to Florida to buy ammunition for a Thompson submachine gun that he saw in Russo's house. He related conversations between these men about how they planned to use the submachine gun in the forthcoming robbery of the bank. He described how they all stayed at a Howard Johnson motel in Fort Lauderdale, and gave the fictitious names that some of them used. It turned out, after their return to Long Island, that the ammunition they bought did not fit the submachine gun. Retained counsel also remained mute during the testimony of Dennis O'Shea concerning the fictitious names and this was stricken because the prosecution failed to produce someone with personal knowledge that the document produced by O'Shea from the Fort Lauderdale motel was a business record.

The hide-and-seek game continued. Retained counsel asked for a recess to decide what he was to do. The prosecutor rested. Then, after making a motion to dismiss for failure of proof, retained counsel announced that he now wanted to cross-examine McCabe. He was not allowed to do this as the government had rested, but Chief Judge Mishler decided to permit retained counsel to call McCabe as a defense witness and ask the same questions he would have asked on cross-examination. The way Chief Judge Mishler put it was that his rulings would be liberal and "that will look to you like cross-examination." So McCabe was recalled and for over 100 pages of the transcript retained counsel, having diligently studied the Grand Jury minutes and all the other materials contained in the file that had been previously given to him, conducted what amounted to a searching and comprehensive cross-examination. He exposed alleged contradictions and it is difficult to see how any other lawyer could have made a more effective attack upon McCabe's credibility.

Retained counsel said that he decided to cross-examine McCabe because Maxey asked him to do so. Maxey liked the way his retained counsel stood up to the judge and complained about being forced to trial without preparation. And we shall find that the calling of various witnesses for the defense, which Maxey's brief suggests was due to lack of preparation and was prejudicial rather than helpful to him, was not due to any lack of preparation but was part of the strategy pursued by Maxey to show he was forced to trial without adequate preparation.

The first instance of this was the calling of Probation Officer Amato. It will be recalled that as early as January, 1973 Mr. Brill had contacted Mr. Amato and had found that he could give no support to the defense of alibi. Chief Judge Mishler, having determined that Maxey's maneuvering was in bad faith, was faced with the possibility that if Amato was called and gave testimony harmful to Maxey it might be claimed, as, indeed, it subsequently was claimed, that he would never have called Amato if retained counsel had been given an adjournment of the trial and time to prepare Maxey's defense.

Chief Judge Mishler proceeded to take steps to get Mr. Amato and have him in court with his records for a conference with Maxey's retained counsel. And both retained counsel Dechter and Mr. Moore, the Assistant United States Attorney

trying the case for the government, spoke with Mr. Amato over the telephone before he came in.

The cross-examination of McCabe was finished and then occurred one of the most bizarre incidents of the trial. Maxey was certainly resourceful and had found a prisoner in the Federal House of Detention who had been "a cellmate or something" with McCabe. Just what was the man's name and what he would testify were not stated. Maxey wanted him called and he wanted his retained counsel to talk to him first. By this time Maxey was running his defense and he was getting along very comfortably with his retained counsel, who had done such a good job cross-examining McCabe. We shall hear more of this.

Then Mrs. Maxey testified to the alleged alibi. She remembered March 24th distinctly because, she said, that was the day she and Maxey were supposed to leave for California. They were living in her mother's house in East Islip and wanted to be in Hauppauge by 8:30 A.M. to see Probation Officer Amato. They owned a Chevy panel truck and drove the 15 miles to the Hauppauge Probation Department to get the papers signed so Maxey could go to California. Maxey was with her every minute all morning. But they did not see Mr. Amato. They inquired and were told that it was not known when he would be in. They also called his Yaphank office and spoke to a person whom they thought was his secretary. She said he might be back and they waited until 11:30 and then left arriving at her mother's house around noon. They left for California by plane about 6:30 P.M. on Monday, March 27th.

We are told that one of the dire consequences of being forced to trial without adequate preparation (see Appellant's Brief, pp. 36–39) was the calling of Probation Officer Amato, without knowing "what Amato would say," all of which is said to have resulted in prejudicial testimony that could have been avoided if Maxey had been given a chance to investigate. The true facts, all of which are right in the record, show that this

argument not only lacks merit but that it is positively misleading. To begin with assigned counsel Mr. Brill had investigated this very matter with Mr. Amato back in January, 1973.

When the same matter came up at the trial, Chief Judge Mishler saw to it that retained counsel talked to Mr. Amato before bringing him in to testify. Counsel told the judge that Mr. Amato told him there had been a telephone call on March 24, just as Mrs. Maxey had said. But the judge was suspicious. So, when Mr. Amato was sworn as a witness, the jury was excused. The judge wanted to be sure, in the event that Mr. Amato testified that he had not told counsel there had been a telephone call on March 24, counsel could have an opportunity to refrain from questioning Mr. Amato on the subject. How this could be twisted around and said to have been without preparation and prejudicial to Maxey is not clear to us. As Chief Judge Mishler doubtless anticipated, Mr. Amato denied having told counsel that there had been a telephone call on March 24, and he insisted that there had been no such telephone call. He further said he remembered the date very well because he had looked it all up when contacted by Mr. Brill in January, 1973. So, before the jury was called in, and after he did know what Mr. Amato was going to testify on the subject, counsel for Maxey, with Maxey at his side, deliberately decided to go ahead. The result was that Mr. Amato not only again denied that the Maxeys had telephoned and that they had come to one of his offices and left word that they wanted to see him, but he produced his records that showed every telephone call and every personal appearance by a probationer and there was no notation of any personal appearance by the Maxeys or any telephone call.

We are told that Mr. Amato gave further testimony that was very prejudicial to Maxey. This is true. But it was inevitable, after Mrs. Maxey's testimony about the alleged alibi, that the government would have called Mr. Amato in rebuttal and have brought out this perfect-

ly relevant testimony. This was by no stretch of the imagination due to the judge's failure to give Maxey a postponement of the trial so that his new counsel could prepare Maxey's defense.

This new and additional testimony by Mr. Amato, brought out as new matter on cross-examination by the prosecutor, was, as we have already noted, that on March 23rd the Maxeys had told him they wanted to go to California but did not have the money to make the trip; and that when he saw them at his regular time on Monday, March 27, shortly after the robbery, they did have the money and he signed the papers permitting Maxey to go to California. He also testified that when he talked to them on March 27th, neither of them said anything about trying to get in touch with him on the morning of March 24th.

When Mrs. Maxey resumed her testimony, there was another incident. In the absence of the jury she insisted that, after they heard in California that there was a warrant out for the arrest of Maxey, one or the other of them had sent a telegram to Chief Judge Mishler saying in effect that Maxey wanted to turn himself in voluntarily. She said she had seen this telegram in the chambers of Chief Judge Mishler. He knew nothing of such a telegram. Each of his two secretaries was called in and they never saw or heard of such a telegram. It turned out that Mrs. Maxey was referring to a letter to Chief Judge Mishler asking him to reduce bail.

The man from Florida appeared and authenticated the motel registration as a business record and Abernathy's testimony about the fictitious names was reinstated.

On the third day of the trial Maxey and his new lawyer called two men from the jail. It turned out that Maxey did not want the man he had previously mentioned without giving any name. He had just located and talked "last night" to the two new men, who were brought over from the Federal House of Detention and testified. That this did Maxey's defense

no good is clear enough. But it is also clear to us that it would be utterly unreasonable to ascribe any resulting prejudice to the refusal by Chief Judge Mishler to give Maxey a postponement so that his new lawyer could prepare for trial. The two witnesses were John De Benedictus and Mark Clancy. They were in "maximum security" with McCabe. Without even claiming to know the name or location of the bank that had been robbed or the date of the robbery they testified that McCabe had told each of them that, while he knew that Maxey "didn't do these bank robberies" and was innocent, McCabe had made a deal with the prosecution by which he would face a sentence of only 10 years for bank larceny and he would say Maxey participated in the bank robberies and might get 30 years. McCabe is supposed to have said that he just picked on Maxey because he was young and that "if anybody could do time, Maxey could do it." All the actual robbers had "absconded" and there was no one else to blame.

De Benedictus said he was shocked to hear this, and then:

"I said, 'How could you do such a thing?'

He (McCabe) said, 'Well, what do I care,' he says, 'I'm getting a break. I'm only going to do a few years. I've done so much time already, this guy's only 23 years old. Let him go do some time.'"

The whole story is vague and completely lacking in details. De Benedictus did not notify the authorities of this and only testified voluntarily because he knew "Maxey didn't rob any banks" and he wanted to see justice done.

The other prisoner, Mark Clancy, who described his convictions as for "bank robbery, robberies, aggravated kidnapping, escape, that's about all," gave testimony more or less to the same effect as that of De Benedictus. He said McCabe told him he was going to say Maxey robbed "the bank" with him "as opposed to naming the actual bank robbers."

McCabe was recalled and denied having any such conversations as testified to by De Benedictus and Clancy.

The summation by retained counsel Dechter was a good professional job. He hammered away especially at the deal he claimed McCabe had made with the prosecutor and Chief Judge Mishler gave him all possible latitude in doing so for its bearing on McCabe's credibility. While it was true that there was no evidence in the record that such a deal had been made, as claimed by the prosecutor, the judge ruled that, from the evidence in the record, it was a fair argument that as a result of what did occur the jury might find that a deal was to be inferred from the fact that McCabe had been permitted to plead to a lesser charge and McCabe had co-operated with the government.

After summation by the prosecutor, Chief Judge Mishler delivered his instructions to the jury. The charge is excellent, clear, brief, comprehensive and without a trace of partiality. There were no exceptions and no claim that any requests for instructions had been erroneously denied. Maxey did not testify in his own defense and, at the request of Maxey's new lawyer, the jury was told in the most explicit terms that his failure to testify was not to be in any way held against him or as any proof in support of the allegations of the indictment. Indeed, Chief Judge Mishler told the jurors that they must not even mention the subject in their deliberations.

We have been at some pains to summarize the entire trial as we think this summary demonstrates that the proof of Maxey's guilt is overwhelming, that there was no defense worthy of the name, and that Maxey's effort to procure an adjournment for the alleged purpose of preparing for trial was made in bad faith and solely for purposes of delay. Thus we conclude that there was no error or abuse of discretion in forcing Maxey to go to trial on March 12th, 1973, nor any suppression of any part of the proceedings at the time McCabe pleaded guilty to two separate bank robberies on February 14, 1973. There follows a brief discussion of the two points argued in appellant's brief.

## II

*Maxey's Application for a Continuance for the Alleged Purpose of Permitting his New Counsel to Prepare for Trial was Properly Denied.*

As the administrative head of the United States District Court for the Eastern District of New York, Chief Judge Mishler knew that Maxey had been previously convicted of armed bank robbery. He also knew that, in addition to the indictment for participation in the armed robbery of the Brentwood bank, Maxey was also indicted for participation with Russo, McCabe and Santillo in the armed robbery of the Hempstead Bank on March 14, 1972. He also knew that Maxey was believed to have participated in a number of other armed bank robberies. Indeed, Chief Judge Mishler had presided over a trial in which Maxey had pleaded guilty and testified against Russo. And this was the trial in which Maxey's mother had called Maxey a narcotics addict and had made a number of other uncomplimentary remarks about Maxey that had shocked the judge. Chief Judge Mishler also knew that on October 25, 1972, many months before the trial, he had appointed Mr. Brill as assigned counsel and he had a right to assume, as proved to be the case, that Mr. Brill had done what was necessary to prepare for trial. Thus, when, without a word of criticism of Mr. Brill, and immediately after McCabe pleaded guilty to bank larceny and it was known that he would testify at the trial, Maxey announced that he wanted to retain other counsel, it is not surprising that Chief Judge Mishler had a pretty good idea of what Maxey was up to. So, in what may well have been unnecessary deference, he gave Maxey the one month's delay he said he needed and set the trial peremptorily for March 12th with the admonition that if Maxey got a new lawyer it had to be one who would not come

in on March 12th and ask for more time to prepare to defend Maxey.

When Chief Judge Mishler did exactly what he said he would do, this is supposed to be a violation of Maxey's constitutional rights. But the judge found on evidence that we think left him no alternative that Maxey's plea for delay was mere strategy and made in bad faith. If Mrs. Maxey had told the new lawyer that Chief Judge Mishler had said they must not retain any lawyer who would come in on March 12th and say he needed time to prepare, Mr. Dechter would probably not have taken the case.

There are many cases containing the exercise of discretion by a trial judge who refuses to postpone the start of the trial. Ungar v. Sarafite, 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964); United States v. Rosenthal, 470 F.2d 837 (2d Cir. 1972), cert. denied, 412 U.S. 909, 93 S.Ct. 2298, 36 L.Ed.2d 975 (1973); United States v. Ellenbogen, 365 F.2d 982 (2d Cir. 1966), cert. denied, 386 U.S. 923, 87 S.Ct. 892, 17 L.Ed.2d 795 (1967). There is no doubt that it is proper for the trial judge not only to consider the question of whether the plea for more time to prepare for trial is made in good faith, but also the public interest in the speedy trial of defendants in criminal cases, see statement of the Circuit Council to Accompany Second Circuit Rules Regarding Prompt Disposition of Criminal Cases, 1971, and United States v. DiStefano, 464 F.2d 845 (2d Cir. 1972); also the time defendant has been in prison awaiting trial, and the over-all nature of the legal representation he has received. United States v. Sanchez, 483 F.2d 1052 (2d Cir. 1973). Only then can it be determined whether representation was "so woefully inadequate 'as to shock the conscience of the Court and make the proceedings a farce and mockery of justice.'" United States v. Currier, 405 F.2d 1039, 1043 (2d Cir.), cert. denied, 395 U.S. 914, 89 S.Ct. 1761, 23 L.Ed.2d 228 (1969), quoting United States v. Wight, 176 F.2d 376, 379 (2d Cir. 1949), cert. denied, 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586 (1950).

It is evident from our reading of the record as a whole, that Maxey's retained counsel, despite the many protestations of unpreparedness to the contrary, adequately defended the appellant. Counsel's statements that he was not ready without more are insufficient to show Sixth Amendment violations. It is the character of the "resultant proceedings" which must be examined. United States v. Wight, supra, at 379. There are stringent standards to be met to show inadequacy of counsel. United States ex rel. Marcelin v. Mancusi, 462 F.2d 36 (2d Cir. 1972), cert. denied, 410 U.S. 917, 93 S.Ct. 977, 35 L.Ed.2d 279 (1973); United States ex rel. Crispin v. Mancusi, 448 F.2d 233 (2d Cir.), cert. denied, 404 U.S. 967, 92 S.Ct. 346, 30 L.Ed.2d 288 (1971).

Nor can we find any support for Maxey's claim in his brief that prejudice resulted from the failure of Chief Judge Mishler to grant a continuance. The alleged alibi had been investigated as early as January, 1973 by assigned counsel Brill. In the absence of the jury retained counsel for Maxey found out that Mr. Amato would not support Mrs. Maxey's claim of what she and Maxey were doing on the morning of the bank robbery. But he called Mr. Amato nevertheless. There just wasn't any defense and no amount of additional time would have sufficed to create one.

McCabe gave a detailed description of the preparations for the robbery and the robbery itself. The operation was planned with military precision—the masks, the gloves, the revolvers, even to the extent of wiping off the bullets so there would be no fingerprints, and what each one was to do in the bank, including holding a stop-watch to make sure they were in the bank no longer than a single minute. As the armed guard was hitting the floor with the bank employees and the customers, one of the robbers took his pistol and Maxey said, "If he makes a move shoot him in the gut." McCabe jumped over the counter, emptied the drawers containing the cash, put the money in a shopping bag and they all ran

out as the signal was given that the time was up. The car that had been stolen at gun point the day before was used to get the robbers, including Maxey, to the place where Russo was waiting in his switch car. At Santillo's home they divided the loot, after Maxey took seven or eight hundred dollars "off the top" to reimburse him for the disbursements he made for the trip to Florida to buy the ammunition for the Thompson machine gun that was not used in the robbery because the ammunition they bought would not fit the gun.

Despite the masks, the photographs taken by the camera in the bank furnished much corroboration of McCabe's testimony as did the testimony of the bank employees.

While the cross-examination of McCabe was searching and comprehensive and a credit to Mr. Dechter, who made good use of the mass of material furnished him by the prosecutor at the direction of Chief Judge Mishler, the fact remains that McCabe's recital of the facts stood up. It must have been apparent to counsel that, after McCabe's testimony was finished, the case was lost despite the proof of McCabe's life of crime and violence, and despite the fact that he had co-operated with the government and had been permitted to plead guilty to a lesser crime with a maximum penalty of 10 years' imprisonment as compared with the 25 years' imprisonment faced by Maxey—20 years for armed bank robbery and 5 for conspiracy.

There remains the claim that retained counsel had been prevented from showing the full extent of the benefits received by McCabe when he pleaded guilty on February 14, 1973, because of the alleged concealment and suppression of this information by the prosecutor. This charge of foul play is wholly without the slightest shred of support in the record.

When he came into court on March 12, 1973, there were three things Chief Judge Mishler was determined to do: First, he would make every reasonable effort to go ahead with the trial. Second, he would take measures to prevent anyone, whether representing the government or defendant Maxey, from letting the jury know anything about Maxey's prior conviction of armed bank robbery, his participation with this same team of bank robbers in other armed bank robberies or his life of crime and violence. This was likely to prove to be a formidable task, especially as there was to be an alleged alibi based on an alleged call on a New York State probation officer, which could scarcely fail to indicate that Maxey had been convicted of some crime in the courts of New York. But Chief Judge Mishler refused to permit the prosecutor to pursue this subject. Third, he would produce an "errorless trial" by ruling out any evidence that might be prejudicial to Maxey and about the admissibility of which there might be the slightest question and by otherwise giving Maxey the benefit of every doubt. We think the lengthy recital we have already made of what occurred at the trial demonstrates that Chief Judge Mishler accomplished each of these objectives.

### III

*There Was No Concealment or Suppression of Any Part of the Colloquy that Occurred when McCabe Pleaded Guilty on February 14, 1973.*

To begin with, and despite Maxey's claim to the contrary, there is not a particle of proof in this record to sustain the claim that retained counsel had no knowledge of all that took place in open court on February 14, 1973. It is also clear, beyond peradventure of a doubt, that there was no concealment or suppression of anything by anyone.

It is conceded on page 35 of Maxey's brief that Mr. Brill, who was still Maxey's assigned counsel, "apparently was present at McCabe's pleading or was aware of what had occurred" and the transcript notes his appearance. This does not look to us like concealment or suppression. And, at the end of the first day of the trial, a huge amount

of 18 U.D.C. Section 3500 and other material was handed to Maxey's retained counsel to help him to prepare for the cross-examination of McCabe. Chief Judge Mishler said, "You'd better take that whole file home with you Mr. Dechter." In addition it is apparent that, even before the delivery to Mr. Dechter of the file and the 18 U.D.C. Section 3500 material, Mr. Dechter must have been in some way informed of everything that had occurred in open court on February 14, 1973. Even if the stenographer's minutes of the February 14, 1973 proceedings were not filed until March 16, 1973, Mr. Brill had ordered a copy and might have received and read it. It is entirely possible that Mr. Dechter received the information from some other source. In any event, it is to be inferred that Mr. Dechter knew what had occurred on February 14, 1973 because, even before he received the file and the 18 U.D.C. Section 3500 material, Mr. Dechter asked Chief Judge Mishler to exclude and he did exclude during the testimony of McCabe any reference to indictment 72 CR 1167, which set forth the details of the armed robbery of the Hempstead Bank, by the same team of Russo, McCabe, Santillo and Maxey on March 14, 1972. It was to the Conspiracy Count of this second indictment to which McCabe also pleaded guilty on February 14, 1973. It does not seem to us to be reasonable to infer that although Mr. Dechter knew the details of McCabe's plea of guilty to bank larceny of the Brentwood bank on March 24, 1972 and to conspiracy to rob the Hempstead Bank on March 14, 1972, he knew nothing of the remarks of the prosecutor, immediately following the two guilty pleas, concerning the other alleged bank robberies by McCabe that the government did not intend to follow up.

■ The accusation of concealment and suppression should never have been made. We reject it and find there was no concealment or suppression by Mr. Moore or Chief Judge Mishler or any-

one else of any part of the colloquy between Chief Judge Mishler and McCabe and Mr. Moore on February 14, 1973.

IV

*The alleged "Deal" or "deals" and the Credibility of McCabe were the Subject of Extended Testimony and Comment, and We Find No Error on this Subject in the Rulings or Instructions of the Trial Judge.*

■ Whether or not Maxey now claims there was a deal between McCabe and the prosecutor, the substance of which was that in return for his co-operation he was permitted to plead guilty to a lesser charge and that McCabe thus had a motive to testify against Maxey and "save his own skin," the undoubted fact is that the existence or non-existence of such a deal was a contested issue at the trial. There were two opposite and perfectly legitimate arguments on this issue and Chief Judge Mishler permitted each lawyer to argue his side in summation, despite the prosecutor's objection on the ground that there was no evidence in the record to support the argument that there was such a deal. It is easy to see how the jury might have found either way, and this issue went to the heart of the question of McCabe's credibility. We think Chief Judge Mishler's ruling and his instructions to the jury on the subject of this "deal" were correct. On the one hand, the prosecutor could claim there was no proof of such a deal, because McCabe had so testified. While the making of this argument by the prosecutor is attacked in Maxey's brief in this Court, no objection was made to it and no request for any instruction on the subject was submitted. On the other hand, as was most vigorously argued by Mr. Dechter, the co-operation with the prosecutor and the plea of guilty of bank larceny instead of to armed robbery reduced McCabe's maximum prison sentence from 20 years to 10 and this "deal" might have provided McCabe with a motive to testify as he did. This was a matter of legitimate defense.

With respect to the "deal" or "deals" that McCabe is said to have revealed to the two prisoners, De Benedictus and Clancy, we think the less said the better.

It is at least clear that Maxey now claims that his retained lawyer should have been told that at the end of the sentencing proceeding the prosecutor had said:

I would state for the record that although the Government had other cases against Mr. McCabe, there are about three other cases which we could indict him for, I have authority to represent the (sic) the Government will not proceed along those lines.

We are repeatedly told what defense counsel would have done on the cross-examination of McCabe had these representations not been "suppressed" as defense counsel could have exposed "the full scope of the benefits to McCabe." That this is mere rhetoric and wholly without merit as an argument for reversal of this judgment is apparent when we recall that defense counsel Brill was present at the time these representations were made, and that Mr. Dechter had already succeeded in keeping away from the jury a very important part of "the benefits to McCabe" by objecting to any reference to his plea of guilty to the Conspiracy Count of the indictment alleging the armed robbery of the Hempstead Bank on March 14, 1972. In this way McCabe was getting the benefit of another additional reduction of possible imprisonment from 25 years to 5 years. Doubtless it was counsel's duty to object to any reference to this armed robbery of the Hempstead Bank because the indictment alleged that Maxey was a participant and McCabe testified before Chief Judge Mishler on February 14, 1973 describing Maxey's participation. But it is scarcely credible that, in the face of this, Maxey's retained counsel would have thought it would be helpful to Maxey's defense to embark upon a detailed survey of the full range of the benefits received by McCabe.

It is not because McCabe was not sufficiently impeached by testimony affecting his credibility that the jury believed him. It was the very vividness of his description of the preparations for the robbery, the details of its execution, including the stop-watch, the loaded hand guns carried by each of the robbers, Maxey's statement after the guard's revolver had been taken from him, "If he makes a move, shoot him in the gut," down to the dropping of two or three bullets out of his revolver as McCabe was getting into the get-away car, and the corroboration of McCabe's testimony by the bank employees, the guard just referred to and others that must have impressed the jury.

The exposure of the full range of the benefits McCabe received when he made his guilty pleas would add little to his exposure as a man who had served two prison terms for bank robbery, that he may have been involved in as many as thirty bank robberies, that he had held up a man at pistol point and robbed him and that he was the man who held a pistol to the head of the man who was sitting in the car they stole in New York City the night before the robbery of the Brentwood bank and made the people in the car get out. A violent, dangerous man who carried a loaded pistol habitually and had led a life of crime since he was a boy. Is it conceivable that the portrayal of the full range of the benefits McCabe received when he pleaded guilty would have added anything to this? We think not.

### Conclusion

We have nothing but praise for the way Chief Judge Mishler stood up to his duty and refused to be hoodwinked. He conducted a fair trial, protected the rights of Maxey at every turn, and he also protected the rights of the United States.

Affirmed.