UNITED STATES of America,
Appellee,

v.

Carmine TRAMUNTI et al.,
Defendants-Appellants.

Nos. 253, 257, 260, 266 to 274, 301 to 302, 309, Dockets 74–1550, 74–1560, 74–1615, 74–1535, 74–1562, 74–1570, 74–1659, 74–1759, 74–1773, 74–1832, 74–1833, 74–2119, 74–1768, 74–1616 and 74–1561.

United States Court of Appeals, Second Circuit.

Argued Oct. 25, 1974.

Decided March 7, 1975.

Herbert S. Siegal, New York City, for appellant Tramunti.

Steven Duke, New Haven, Conn. (Frank Lopez, Brooklyn, N. Y., of counsel), for appellant DiNapoli.

Ivan Fisher, Rosner, Fisher & Scribner, New York City (Nancy Rosner, Alan Scribner, New York City, of counsel), for appellants Inglese, Christiano and Ceriale.

Nancy Rosner, Rosner, Fisher & Scribner, New York City (Ivan Fisher, Alan Scribner, New York City, of counsel), for appellant Inglese.

Arthur F. Golden, New York City (Robert B. Fiske, Jr., New York City, of counsel), for appellant Gamba.

Robert L. Ellis, New York City, for appellant Mamone.

Martin Jay Siegel, New York City, for appellant Springer.

Gary R. Sunden, New York City, for appellant Alonzo.

Theodore Rosenberg, Brooklyn, N. Y., for appellant Pugliese.

George David Rosenbaum, New York City, for appellant D'Amico.

Robert Leighton, New York City, for appellant Robinson.

Julia P. Heit, New York City (Edward S. Panzer, New York City, of counsel), for appellant Ware.

Harry R. Pollak, New York City, for appellant Salley.

Michael G. Dowd, Kew Gardens, N. Y., for appellant Russo.

Paul J. Curran, U. S. Atty., S. D. N. Y. (Thomas M. Fortuin, Thomas E. Engel, Frederick T. Davis, Jeremy G. Epstein, Lawrence S. Feld, John D. Gordan, III, Asst. U. S. Attys., of counsel), for appellee.

Before WATERMAN, OAKES and GURFEIN, Circuit Judges.

OAKES, Circuit Judge:

This is an appeal by William Alonzo, Joseph Ceriale, Donato Christiano, Vincent D'Amico, Joseph DiNapoli, John Gamba, Louis Inglese, Angelo Mamone, Frank Pugliese, Warren C. Robinson, Frank Russo, Henry Salley, John Springer, Carmine Tramunti and Hattie Ware from judgments of conviction entered on April 22, May 2, May 3, May 7, May 10 and May 22, 1974, in the United States District Court for the Southern District of New York after an eight-week trial before Kevin T. Duffy, Judge, and a jury.

Indictment.

Indictment 73 Cr. 1099, filed December 6, 1973, which superseded indictments 73 Cr. 334 and 73 Cr. 931 filed April 13, 1973, and October 3, 1973, charged the 15 appellants and 17 other defendants in 30 counts, with a variety of violations of the federal narcotics laws. Count One charged the 15 appellants and 17 other defendants with a conspiracy to violate the federal narcotics laws from January 1, 1969, until December 6, 1973, the date of the filing of the indictment. Count Two charged Inglese with a continuing criminal enterprise in violation of 21 U.S.C. § 848. Count Three charged Inglese and Joseph DelVecchio[1] with the receipt of 30 bags of heroin in June, 1969. Count Four charged Inglese and DelVecchio with receiving one-half ounce of heroin in June, 1969. Counts Five and Six charged Inglese with receiving one-ounce quantities of heroin in October, 1969. Count Seven charged Benjamin Tolopka[2] with receiving one-quarter kilogram of cocaine in August, 1970. Count Eight charged Inglese with receiving one-quarter kilogram of cocaine in September, 1970. Counts Nine and Ten charged Dominick Lessa with the sale of one-half kilogram of heroin and five-eighths of a kilogram of cocaine in October, 1970. Counts Eleven through Thirteen charged Inglese, DelVecchio and Christiano with selling three-quarter kilogram quantities of heroin in December, 1970. Count Fourteen charged Inglese with receiving one ounce of heroin in February, 1971. Count Fifteen charged Pat Dilacio[3] with possession of one-eighth kilogram of heroin with intent to distribute in May, 1971. Count Sixteen charged Frank Pugliese and Russo with possession with intent to distribute one-eighth kilogram of heroin in May, 1971. Count Seventeen charged Joseph Marchese[4] with possession of one-half kilogram of heroin with intent to distribute in June, 1971. Count Eighteen

---

1. DelVecchio pleaded guilty to six counts, not including Count Three or Four.

2. A mistrial was declared as to Tolopka.

3. Dilacio became a fugitive prior to trial.

4. Judge Duffy entered a judgment of acquittal with respect to Joseph Marchese prior to submitting the case to the jury.

charged Dilacio and Pugliese with possession of one-half kilogram of heroin with intent to distribute in September, 1971. Count Nineteen charged Springer with possession of one-eighth kilogram of heroin with intent to distribute in November, 1971. Count Twenty charged Pugliese and Dilacio with possession of one-half kilogram of heroin with intent to distribute in September, 1971. Count Twenty-one charged DiNapoli and Dilacio with possession of two kilograms of heroin with intent to distribute in December, 1971. Count Twenty-two charged Pugliese and Dilacio with possession of three kilograms of heroin with intent to distribute in January, 1972. Counts Twenty-three and Twenty-four charged Inglese, DelVecchio, Thomas Lentini[5] and Ceriale with possession of three kilogram quantities of heroin with intent to distribute in July and October, 1972. Count Twenty-five charged George Toutouian[6] and D'Amico with possession of one-quarter kilogram of heroin with intent to distribute in November, 1972.[7] Count Twenty-six charged Russo with possession of one-quarter kilogram of heroin with intent to distribute on January 10, 1973. Count Twenty-seven charged Tramunti, Inglese, DelVecchio and Ceriale with possession of three kilograms of heroin with intent to distribute in May, 1973. Count Twenty-eight charged Inglese and Lentini with possession of one-half kilogram of cocaine with intent to distribute in May, 1973. Count Twenty-nine charged Lentini and Lessa with possession of one-eighth kilogram of cocaine with intent to distribute on May 30, 1973. Count Thirty charged Basil and Estelle Hansen with possession of 767 grams of heroin with intent to distribute on October 4, 1973.[8] Seven counts were severed prior to or during trial.[9]

Trial began on January 21, 1974, as to 18 defendants. During the course of the trial, the case against one defendant was severed.[10] Prior to submitting the case to the jury, Judge Duffy dismissed Count Twenty-seven. On March 13, 1974, after five days of deliberation, the jury found the appellants guilty on all remaining counts in which they were named.

Facts.

At trial, five participants in the alleged conspiracy testified to its operations and personnel: John Barnaba, Frank Stasi, Henry Pannirello, Thomas Dawson and James Provitera. Their collective testimony, summarized below, and corroborated extrinsically in certain details, established the existence of a large, well organized conspiracy to buy, process and distribute narcotics in New York, New Jersey and Washington, D. C.

## I. John Barnaba's Testimony.

John Barnaba was a middle level distributor in the narcotics conspiracy here charged. Initially he worked for and purchased narcotics through Inglese who was a principal in one branch of the narcotics operation. Subsequently, Barnaba worked for the other major branch of the operation headed by DiNapoli and Pugliese (see III, below). Owing to his unique position, Barnaba's testimony thus served to develop the general framework of the entire conspiracy and identify most of its major participants. From that testimony the jury may be taken to have found as follows.

---

**5.** Thomas Lentini pleaded guilty to Counts One and Twenty-three.

**6.** Defendant Toutouian was murdered prior to trial.

**7.** In connection with this charge, appellant D'Amico raises a "sufficiency" argument that the indictment charged a purchase of heroin in November, 1972, and the proof showed that this transaction occurred a month or two later.

**8.** Both Basil and Estelle Hansen are fugitives.

**9.** Five counts—Nine, Ten, Fifteen, Twenty-two and Thirty—charged defendants who were not on trial. Count Twenty-six charging appellant Russo with distributing one-quarter kilogram of heroin on January 10, 1973, was severed at trial at the Government's request. Count Two was severed during trial.

**10.** Defendant Al Greene fell down a flight of stairs and fractured his skull during the trial.

## A. *The Louis Inglese Operation: Inglese, Christiano, Mamone.*

Barnaba's latter-day involvement in the business of distributing narcotics began in 1969, in response to requests from a would-be customer, Richard Forbrick. In July of 1969, Barnaba met with appellant Inglese, whom he had known for some 15 years, and asked if Inglese could supply him with "goods." Inglese said that he could and told Barnaba that he could be reached at the Beach Rose Social Club or Beach Rose Club, located at 3202 Wilkinson Avenue in the Bronx.

The following month, Barnaba in the Beach Rose Club placed an order with Inglese for a quarter kilogram of heroin (at a price of $5,500) and the same amount of cocaine (at $3,000), or, in the parlance, "a quarter of H and a quarter of coke." Inglese's associates, DelVecchio and Christiano, passed the narcotics to Barnaba later that night. Barnaba then delivered the heroin to Forbrick and the cocaine to Forbrick's customer, Benjamin Tolopka. When Barnaba later made payment to Inglese for these drugs he was told that in future transactions payment had to be in advance of delivery.

In September and early November of 1970, Barnaba made three more purchases of drugs from Inglese. In late November of 1970, while Barnaba was making yet another such purchase, he came in contact with appellant Mamone. Mamone, who was present at the Beach Rose Club when Barnaba was making a payment to Inglese, was summoned by Inglese, and together they counted Barnaba's payment.[11] Subsequently, Mamone was to be of considerable assistance to Barnaba in his narcotics dealings.[12]

In December, 1970, Barnaba paid Inglese $3,500 received from Forbrick for an eighth of a kilogram of heroin. When after ten days or more Inglese was unable to supply the "eighth," Forbrick asked Barnaba to get back his $3,500. Barnaba went to the Beach Rose Club to tell Inglese of Forbrick's concern, suggesting in Mamone's presence that Inglese meet Forbrick in order to allay the latter's fears and to make it possible for him to deal directly with Inglese should something happen to Barnaba. Inglese replied that he did not want to meet Forbrick, but when Mamone, who was listening, made assurances that (in Barnaba's words) "he was all right, . . . he knew his wife, . . . he was okay, there was nothing wrong with him," Inglese relented. After Mamone had vouched for Forbrick, Barnaba introduced Forbrick to Inglese at the Club and Forbrick accepted Inglese's suggestion that he await delivery. After additional delay in delivery of this order, however, Barnaba, at Forbrick's urging, recovered the $3,500 from Inglese and returned it to Forbrick.

After a brief hiatus in early 1971, Barnaba resumed his narcotics dealings in June, 1971, when he obtained $3,000 worth of narcotics from Inglese for sale to a new customer named Burke. Burke was dissatisfied with the quality of the drugs and demanded the return of his money. In an attempt to get the money, Burke sent two men, one carrying a gun, in search of Barnaba, and later Burke himself sought out Barnaba at his home.

Barnaba later mentioned the Burke affair to Inglese at a time when Mamone was present; Mamone told Barnaba that he would contact Burke to try to "straighten out" Barnaba's problem.

---

11. On this occasion, the delivery of the heroin to Barnaba was made later that night by Christiano in the presence of Inglese and DelVecchio, in the back yard of Inglese's residence in the Bronx.

12. Barnaba testified that Dilacio, a member of the DiNapoli/Pugliese operation, informed him that "Butch" Mamone was DiNapoli's partner in the narcotics business. This hearsay testimony was admissible against Mamone once it was established that Mamone was a member of the conspiracy, and against DiNapoli once it was established that he was a member of the conspiracy. United States v. D'Amato, 493 F.2d 359 (2d Cir.), cert. denied, 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 50 (1974).

Mamone told Barnaba that Burke was also his customer and that Burke owed him $25,000 or so. Two or three days later outside the Beach Rose Club, at a meeting filmed by a city detective, Mamone informed Barnaba that he had told Burke to deduct the $3,000 from the money owed by Burke. Mamone said that now Barnaba owed him the $3,000. Mamone's call on Burke was apparently successful, for Barnaba never heard from him or his gun-carrying friends again.

### B. *The Joseph DiNapoli Operation: DiNapoli, Pugliese, Dilacio.*

In July or August of 1971, Barnaba met appellant Frank "Butch" Pugliese outside of the Beach Rose Social Club. Barnaba's drug business was "doing bad," possibly because of a shortage of customers or supply. In any event, Pugliese introduced him to a new customer, John "Hank" Springer, informing the latter that thereafter if he needed anything he should get it from Barnaba. Pugliese, who was soon to go to jail, then introduced Barnaba to Pannirello and defendant Dilacio, telling these two that they should supply Barnaba with heroin on consignment, the price being agreed upon at $25,000 per kilogram. A few nights later Barnaba filled Springer's order for one-eighth of a kilo of heroin at $3,500 with heroin obtained from Dilacio at $3,000. Thus, Barnaba was accepted into what will be seen as the DiNapoli-Pugliese branch of the conspiracy. While Inglese had required that Barnaba pay *in advance* for his drug purchases, Barnaba worked on consignment with the Pugliese-DiNapoli group. Barnaba continued to work with Pannirello and Dilacio, selling drugs obtained from them to Springer and appellant Russo, until November, 1972, when he (Barnaba) was arrested on narcotics charges by the New York City police.

### II. *Frank Stasi's Testimony: Inglese, Ceriale, D'Amico.*

The testimony of Frank Stasi, in the light most favorable to the Government, served to develop further the workings of the Inglese narcotics operation. Stasi, who worked for a time as a steward at the Beach Rose Social Club, had frequent contact there with Inglese, DelVecchio, Mamone and Christiano.

Stasi was involved in a series of at least eight "mixing sessions," some at his own apartment, some at DelVecchio's apartment. In each of these he, DelVecchio, on one occasion Christiano and on two occasions defendant Lentini mixed three kilograms of heroin with the dilutant mannite to obtain 12 half-kilogram packages.[13] Much of the mannite was obtained from appellant Ceriale at a price of $2,000 for three kilos. For all but the first mixing session, Inglese paid Stasi $2,000, the payments taking place at the Beach Rose Social Club, the "Blue Lounge" or in Inglese's own basement. Occasionally Stasi was paid by Inglese after the latter's receipts were counted by the two of them, DelVecchio and on one occasion Christiano. Money, totaling $30–40,000 each time, was counted and separated into stacks of $1,000.

The Inglese group had operated out of the Beach Rose Social Club for some time, but when in April, 1972, it was discovered (by a tip from some men working on the elevated railway on Wilkinson Avenue) that the Club was under police surveillance, LoPiccolo's Espresso House became a center for the narcotics business. A substantial amount of Stasi's testimony dealt with meetings at LoPiccolo's, and conversations overheard there involving Inglese's alleged partner, Carmine Tramunti, who ran a card game there. A more detailed statement of the facts involved in these conversations will be developed later in discussing appellant Tramunti's participation in this conspiracy.

---

**13.** Objective proof of the "mixing sessions," four of which took place at Stasi's own apartment, was obtained by a forensic chemist who, after Stasi's arrest, obtained a trace of heroin from between the leaves of Stasi's kitchen table and traces of mannitol (the main ingredient of mannite) under the refrigerator.

Stasi also recounted obtaining a small amount of cocaine and using it as a sample which he gave to appellant D'Amico at the Centaur Bar on 46th Street in Manhattan, and subsequently a $7,000 heroin sale from Stasi to D'Amico.[14]

### III. The Testimony of Harry Pannirello, Jimmy Provitera and Thomas Dawson.

The testimony of Pannirello, Provitera and Dawson, again in its best light from the Government's point of view, revealed in detail the inner workings of the DiNapoli-Pugliese sphere of the narcotics distribution operation. Each of these three played an important role in providing a supply of narcotics to a number of middle level distributors.

#### A. The Pugliese-DiNapoli Operation: Alonzo, Hattie Ware and DiNapoli.

In April, 1970, Pugliese introduced Pannirello to appellant Hattie Ware and to two fugitive defendants, Basil Hansen and his wife Estelle ("Bunny"), and the late Al Greene, distributors who operated out of two apartments in a building at 1380 University Avenue in the Bronx. Thereafter, Pannirello delivered numerous packages of narcotics to Greene and Basil Hansen, with Hattie Ware often present. Pannirello and his associate, Dilacio, sometimes paid Hattie Ware to deliver to the same two distributors.

On one occasion the appellant Alonzo, Hattie Ware's brother, asked Pannirello if he could obtain an amount of heroin "to start off small." Pannirello offered Alonzo two ounces of heroin for $2,000 and Alonzo accepted, paying only $1,000 or $1,500, however.

Thereafter, Provitera, Pannirello's brother-in-law, started making narcotics deliveries at 1380 University Avenue. On the first of these, Pannirello introduced him to Hattie Ware and Alonzo. Eventually, Basil Hansen arrived; Alonzo, Pannirello, Provitera and Hansen went to Alonzo's bedroom where Provitera and Pannirello handed a package of heroin to Hansen. Provitera subsequently delivered packages to Ware for Basil Hansen, as well as directly to Hansen in the street outside the University Avenue apartment house.

Pannirello also had direct dealings with appellant Joseph DiNapoli. In June of 1971 Pannirello accompanied Pugliese to the residence of Genevieve Patalano, DiNapoli's girlfriend, at 1908 Bronxdale Avenue in the Bronx. At this time Pugliese indicated that he was working with or for DiNapoli and that he had money to be delivered. He had decided, however, not to give DiNapoli all the money, but instead hid some of it in a sock. DiNapoli accepted this money, some $8,000 or $10,000, without even counting it all out.

Pugliese went to jail in October, 1971. Before he left, he turned over some of his narcotics business to Pannirello and Dilacio. Pugliese told Pannirello and Dilacio that he was leaving two kilograms of heroin and some cash with them. It was agreed that Dilacio was to be the sole contact with DiNapoli, paying DiNapoli $22,000 per kilogram of heroin, and taking it to a "stash," whence Pannirello would make future pick-ups and deliveries. Pannirello and Dilacio were also to deliver narcotics on consignment to Barnaba at wholesale prices. Dilacio was to pick up two kilograms immediately from DiNapoli and store them in Pugliese's garage. Pannirello and Dilacio were to pay over some of the profits to Pugliese's wife but to save the rest until Pugliese's release, whereupon they were to divide it up.

The next night Pannirello went to the "stash," a garage near Pugliese's house, obtained a half kilogram of heroin, and delivered it to Thomas "Tennessee" Dawson, one of Pugliese's customers from Washington, D. C., for $16,000 in cash. Pannirello then distributed the re-

---

14. This meeting at the Centaur was observed by a plainclothes police officer. After Stasi's arrest on May 22, 1973, he agreed to cooperate with police. He was released and is in federal protective custody, having assumed a new identity.

maining one and a half kilograms among Barnaba, Basil Hansen and Al Greene.

Five or six months after Pannirello saw DiNapoli accept drug money from Pugliese, in late November or December, 1971, Dilacio told Pannirello that he had called DiNapoli to get some heroin and that DiNapoli was going to furnish him a kilogram for $22,000.[15] Dilacio said he would pick up the heroin from DiNapoli and take it to a "stash" at appellant John Gamba's house. Pannirello went to Gamba's house, met Dilacio and examined the kilogram of heroin in Gamba's presence. Gamba was paid $300 a week for storing the heroin. On one occasion in December, 1971, or January, 1972, in Pannirello's presence, Dilacio called "Joe" [DiNapoli] on the phone to buy narcotics but, as Dilacio told Pannirello, "Joe told him to sit tight and he'll let him know as soon as something comes up, but there was nothing happening right now."

Further evidence as to DiNapoli was obtained on February 3, 1972, while agents of the Joint Narcotics Task Force were conducting surveillance of his lady friend's house at 1908 Bronxdale Avenue in the Bronx. At about 8:45 p. m. Vincent Papa (an unindicted coconspirator) drove up with Joseph DiNapoli at his side. DiNapoli left the vehicle carrying a large suitcase. An officer conducting the surveillance testified that the suitcase was being carried with one hand and appeared light. Sometime later, Papa and DiNapoli left the house, the latter carrying what appeared to be the same suitcase; now, however, the police officer testified, DiNapoli was carrying it with two hands, as if it were heavy. Both men got back in the car and after driving seven blocks were arrested. The arresting officers opened the suitcase and found that it contained $967,450, principally in $100 and $50 bills.[16]

There are substantial legal and factual disputes in connection with this seizure, the appellants contending that the police lacked probable cause to make the seizure. Therefore the facts will be stated in greater detail below in connection with the discussion of the issues raised by the seizure and the introduction of the $967,450, or more accurately a photo of same, into evidence.

### B. John Gamba and John Springer.

In the spring of 1972, Pannirello introduced Provitera to the appellant Gamba. Provitera then began picking up packages of drugs from him at his house on Rosedale Avenue in the Bronx. On Provitera's second visit, Gamba helped Pannirello mix, weigh and package heroin. Subsequently, Provitera picked up packages from Gamba on two occasions and delivered them to Basil Hansen. In June, 1971, Pugliese took Pannirello to the apartment of appellant Springer to collect money owed to Pugliese by Paul DiGregorio, who worked with Springer

---

**15.** Hearsay cannot, as we said in United States v. Cirillo, 499 F.2d 872, 885 (2d Cir. 1974), "be used as a supplement to, much less as a substitute for, insufficient nonhearsay proof." Hearsay implicating one conspirator from a coconspirator is admissible, however, once there is sufficient independent evidence to show the first to be a member of the conspiracy. See United States v. D'Amato, supra note 12; United States v. Manfredi, 488 F.2d 588 (2d Cir. 1973), cert. denied, 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974). There is no confrontation problem where both declarant and listener knew themselves to be members of the conspiracy at the time the statement is made. United States v. Mallah, 503 F.2d 971, 980 (2d Cir. 1974).

**16.** The defense presented evidence that DiNapoli was a major participant in the loanshark or shylocking business (for which he was convicted and sentenced to three years imprisonment), and the argument was that the suitcase money came from this other form of illegitimate enterprise. But the drug activities at 1908 Bronxdale Avenue (see below) and the accompaniment of Vincent Papa doubtless could have induced the jury to think that some of this money was drug money; Pugliese had told Barnaba that Papa (whom Pugliese called "Uncle") supplied Inglese with heroin and had told Pannirello that DiNapoli was in partnership in the narcotics business with "Vinnie." It was stipulated to that this "Vinnie" was not appellant Vincent D'Amico; the jury might have inferred that it was Papa, an unindicted coconspirator, since he was the one accompanying DiNapoli to 1908 Bronxdale Avenue where they picked up the $967,000 in cash.

in the narcotics business and was agent for Pugliese.[17]

Further evidence against Springer was uncovered when, on December 3, 1973, officers of New York City's Organized Crime Control Bureau went to his apartment to execute a bench warrant for his arrest based upon his failure to appear on the indictment in this case. In the apartment they found, in addition to Springer, quantities of heroin and cocaine.

### C. Frank Russo.

Frank Russo was implicated in this conspiracy through his contact with both Barnaba and Pannirello. In the spring of 1972 Pannirello met the appellant Russo, who purchased one-half kilogram of heroin which he later returned after his customer refused to pay. On the night of January 5, 1973, at a meeting among Russo, Barnaba and an undercover agent of the New York City Police Department, Russo gave the undercover agent a sample of heroin. After an unsuccessful attempt to buy a half kilogram of heroin on January 9, 1973, the undercover agent, again accompanied by Barnaba, bought approximately a half kilo from Russo for $19,500. On January 16, 1973, Russo again delivered heroin to the undercover agent to make up for the fact that the previous delivery was found to amount to less than a full half kilogram.

### D. The Washington, D. C., Distribution: Warren Robinson and Henry Salley.

Beginning in February, 1971, Thomas Dawson purchased one-half kilogram of heroin every week or so from Pugliese directly and from Pugliese's agent, Paul DiGregorio, the heroin going to Washington, D. C., where appellant Robinson cut the narcotics and distributed them to retailers in the area.

In August, 1971, Pugliese drove Pannirello to a street near Co-Op City in the Bronx and introduced him to Dawson. Pugliese told Dawson that Pannirello would take over his narcotics business when Pugliese went to jail. Subsequently Pannirello and Pugliese sold Dawson a half kilogram of heroin for $16,000 in cash.

Thereafter, Dawson was a regular purchaser of heroin from Pannirello, for distribution by Robinson in Washington. Deliveries to Dawson were in the parking lot of a Howard Johnson's on Route 46 in New Jersey, where in the spring of 1972 Dawson introduced Pannirello to Robinson. At this meeting Pannirello sold a kilogram of heroin to Robinson for $37,000. Later Robinson became the pick-up man, and in late May, 1972, Pannirello sold two or three kilograms of heroin to him at $37,000 each. Thereafter, Provitera made numerous deliveries of quarter kilos to Robinson at the Route 46 Howard Johnson's at the going high price.

Although business slowed up in the summer, deliveries to Robinson were resumed in the fall of 1972; that Howard Johnson's had a twenty-ninth flavor. On one delivery in October of that year, Robinson introduced Provitera to appellant Salley. Robinson said that Salley was "his man" and that deliveries should be to Salley thereafter. Two weeks later, Provitera, on Pannirello's instructions, delivered heroin to Salley at the same location and told Salley that Pannirello would be in touch with Robinson. In November Pannirello and Provitera drove again to the Howard Johnson's to meet Robinson; Salley told them that Robinson was on his way from Washington, and when Robinson arrived, Pannirello and Provitera accompanied him to Salley's motel room. There Robinson, in Salley's presence, registered a customer's complaint, that previously furnished "dope" was of bad quality. The four then arranged for delivery of one kilogram of heroin and Robinson paid Pannirello $19,000.

17. DiGregorio, "The Arrow," would inter alia collect money for narcotics sold to Washington, D. C., dealer Warren Robinson. When Thomas "Tennessee" Dawson met DiGregorio the latter was limping from a shot in the knee he said he had received from Pugliese. DiGregorio said he had been told by Pugliese to collect the money owed Pugliese by Robinson or not come back to New York. See IIID infra.

In February, 1973, Pannirello and Provitera were arrested after making three heroin sales to an undercover agent of the Drug Enforcement Administration, after which both agreed to cooperate with the Federal Government in this case.

Discussion.

I. *The arrest of appellant DiNapoli and the search and seizure of the suitcase.*

■ Appellants claim that the $967,-450 found in a suitcase in the possession of appellant DiNapoli and Vincent Papa was seized illegally and that its contents should have been suppressed.[18] Their arguments, stated in summary fashion, are that the police had neither probable cause to arrest Papa and DiNapoli nor probable cause to search the suitcase. Further, appellants maintain that even if the police had probable cause to arrest Papa and DiNapoli, the contents of the suitcase should not have been admitted into evidence since the search of the suitcase was neither incident to the arrests nor was it valid under any exception to the fourth amendment's requirements for probable cause. We find to the contrary that there was both probable cause to arrest DiNapoli and Papa and to search the suitcase in question.

As the Supreme Court has stated, "The constitutional validity of a warrantless search is preeminently the sort of question which can only be decided in the concrete factual context of the individual case." Sibron v. New York, 392 U.S. 40, 59, 88 S.Ct. 1889, 1901, 20 L.Ed.2d 917 (1968). We turn then to the events of the evening of February 3, 1973, as recounted by Judge Duffy in his opinion on the suppression hearing. United States v. Tramunti, 377 F.Supp. 1 (S.D.N.Y.1974).

On that rainy evening, Patrolman John Reilly and (then) Detective John Spurdis of the New York Joint Narcotics Task Force drove in an unmarked police car to the vicinity of 1908 Bronxdale Avenue, Bronx, New York, to execute a "John Doe" narcotics arrest warrant. The reasons which led them to believe that the arrest target might be at the Bronxdale Avenue house were as follows. One Frank Facchiano had been observed by the police on September 2, 1971, while engaging in two heroin sales at the Cottage Inn Bar & Grill in the Bronx, which on at least four occasions was used as a location for narcotics transfers. During these transactions, Facchiano had been observed in conversation with someone seated in a car registered to Genevieve Patalano (later identified as Joseph DiNapoli's girlfriend), at the 1908 Bronxdale Avenue address. Furthermore, in October, 1971, the owner of the Cottage Inn Bar & Grill, Joseph DiBenedetto, was observed leaving the very same address in possession of a stolen car; when he was arrested, he falsely claimed that he resided at that address. Prior to the night of February 3, 1972, Patrolman Reilly had been on surveillance at that address for some 20 evenings in the hope of finding "John Doe # 3," one of the persons seen engaged in the transactions with Facchiano at the Cottage Inn Bar & Grill. United States v. Tramunti, 377 F.Supp. at 2.

■ At 8:30 p. m. Reilly and Spurdis saw an unidentified older man leave the one-family house, enter an automobile, and drive off. At 8:45 p. m. a 1968 green Pontiac pulled up in front of the house and stopped. Joseph DiNapoli who was not identified until the time of (his arrest) emerged from the passenger side of the car carrying a suitcase in one hand. The driver of the car made a "U" turn, parked on the opposite side of the street and also emerged. Reilly and Spurdis immediately recognized the driver as Vincent Papa, whose record in-

---

**18.** Appellants DiNapoli, Inglese, Christiano, Ceriale and Pugliese all claim that the money was illegally seized; however, only DiNapoli, from whom the money was seized, has standing to challenge the legality of the seizure.

Brown v. United States, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); Alderman v. United States, 394 U.S. 165, 174, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

volved a previous narcotics conviction. Upon information from someone they then thought was a reliable informer, they suspected Papa to be a major narcotics trafficker,[19] and at least Group Supervisor Peter Pallatroni knew that Papa had been indicted for narcotics violations in the Eastern District of New YOrk. *Id.* at 2–3.

Both DiNapoli and Papa entered the house without knocking or waiting to be admitted. Reilly radioed Pallatroni who, accompanied by Special Agent James Reed, also drove to 1908 Bronxdale Avenue. When Pallatroni arrived, Spurdis reported what he and Reilly had observed.

Pallatroni, a highly experienced narcotics agent, had been a Special Agent with the Drug Enforcement Administration for eight years and for two years had supervised a group of ten narcotics agents. He had participated in approximately 100 investigations of narcotics wholesalers resulting in the arrest of more than 200 major narcotics violators.

Pallatroni testified that at the time of this arrest Vincent Papa was regarded by the Bureau of Narcotics and Danger-

ous Drugs as "one of the top narcotics traffickers" in the United States. He was fully aware that Papa had been convicted of violation of the federal narcotics laws and that he had been sentenced to five years in prison.

In addition to the information supplied by Garland, note 19 *supra*, Pallatroni was aware, as we have said, that Papa and approximately 20 other persons had been named in a federal narcotics conspiracy indictment, filed in the Eastern District of New York, which had been unsealed in January, 1972. Pallatroni also knew from surveillance he had conducted that Papa had a relationship, dating back to 1967, with Facchiano, one of the targets of the investigation which had led the officers to 1908 Bronxdale Avenue.

Thus, the officers were reasonably alerted simply by Papa's presence at this particular address to the very live possibility that a narcotics transaction was in the making. The officers' suspicions were quite reasonably reinforced by the events which later transpired.

Upon receiving from Spurdis the license plate number of the green Pontiac

**19.** On December 18, 1973, less than two months before the arrest of Papa and DiNapoli, Pallatroni had arrested a narcotics dealer named Stanton Garland, who thereafter provided further information about Papa's recent narcotics activities. Garland told Pallatroni and other agents that he could introduce an undercover agent to Rocco Evangelista and Daniel Ranieri, who he said were distributing narcotics for Vincent Papa, for the purpose of purchase a minimum of a kilogram of heroin which at that time sold for $25,000. Garland further stated that he personally had discussed narcotics with Papa on two separate occasions. Garland identified Papa, Evangelista and Ranieri in photographs shown to him and a significant part of the information which he provided concerning them was independently corroborated by the agents.

Appellants argue that the information supplied by Garland should be discounted in evaluating whether the officers had probable cause to arrest Papa and DiNapoli or to search the suitcase in question. They argue, in essence, that the Garland information was stale because a month and a half had elapsed between the time that the information was given and the time of the events in question. In addition, they argue that Garland was unreliable as

an informer, because he had become a fugitive rather than testify in another case, and because he committed various criminal acts while supposedly cooperating with the Joint Task Force. United States v. Tramunti, 377 F.Supp. 1, 2 (S.D.N.Y.1974). But Garland's information was very general, indicating only Papa's position as a high echelon figure in narcotics trafficking, not the sort of information that would become stale quickly. Garland's information was in many ways only cumulative to what the officers already knew. Quite obviously knowledge that a suspect has been a narcotics dealer or offender or has consorted with a narcotics dealer may be one important element of probable cause. United States v. Harris, 403 U.S. 573, 583, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971).

As to appellants' claim of unreliability, this court has recently observed:

Informants in drug cases are not Brahmins, nor are they noted for long term occupancy of well-tended premises. Their disappearance, voluntary or otherwise, is not extraordinary.

United States v. Malizia, 503 F.2d 578, at 581 (2d Cir. 1974), quoting United States v. Super, 492 F.2d 319, 322 (2d Cir. 1974).

in which Papa had arrived, Pallatroni radioed the information to the headquarters of the New York Joint Task Force to ascertain the name of the record owner of the car. Pallatroni testified that he was informed that the vehicle was a rental or leased car owned by "Wide World Leasing Corporation" of Far Rockaway, New York. Pallatroni had information that Papa owned two cars.

The use of a lease or rental car by a major narcotics violater was in and of itself significant. Experienced narcotics officers know that individuals engaged in narcotics trafficking and other areas of organized crime frequently use rented or leased vehicles in an effort to conceal their identity. They also know that many of these criminals are aware that cars used to transport narcotics or other contraband, if seized, are generally subject to forfeiture, unless the owner is an auto rental company.

Appellants sharply contest the reliability of Pallatroni's testimony in this matter. The foundation for their argument is a log which was kept of communications between Pallatroni and the police station which provided him with what Pallatroni testified was the information that the car being driven by Papa was one belonging to Wide World Leasing.

The existence of the log was, appellants maintain, an issue which was raised below; appellants, however, contend that the Government failed to disclose its existence. The Government claims that here was no such suppression of evidence and that the log in question was obtainable by the defendants at the original suppression hearing before Judge Duffy had they asked for it.

We do not have to resolve this issue, however. Testimony concerning this log was recently developed in a hearing before Judge Charles L. Brieant of the United States District Court for the Southern District of New York, unrelated to the present case but involving some of the same evidence. In order to avoid the necessity of remand on this issue, this court will address itself to the question of · probable cause taking into account the transcript of the hearing held before Judge Brieant as requested by appellants' motions.

Appellants maintain that the log in question shows that Pallatroni radioed in a "dealer" plate on the car driven by Papa and that he received the information that the plates belonged to "Wides Motor *Sales*." Pallatroni steadfastly maintained at the hearing before Judge Brieant that he was told that the car belonged to "World Wide Leasing."

Appellants argue with more bombast than effect that this new knowledge is significant in that it undermines Pallatroni's basis for suspecting that a narcotics sale was in progress and that a *leased* car was being used in order to prevent a forfeiture of the vehicle in the event of arrest. Appellants suggest that there will not be remittal when a *dealer* lends a car. *See* Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 689 n. 27, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974). Even if this were so, there remains the fact that use of a dealer's car quite as effectively as the use of a rented car conceals the identity of the operator of a vehicle—a factor which a trained police officer would treat as important in assessing the events that took place on the evening of February 3, 1973. When one is dealing with large amounts of heroin (or cash), moreover, the complexities in the Government's forfeiture treatment of automobiles may well not be uppermost in one's mind, nor would they enter into the police officer's. Thus even viewing the evidence raised before Judge Brieant in the light most favorable to appellants, Officer Pallatroni would still have had extra reason to suspect the nature of Papa's activities on the night in question. The events occurring shortly thereafter ripened reasonable suspicion into probable cause for belief that Papa was engaging in a major narcotics violation under the eyes of the officers surveilling the house.

At about 8:55 p. m. Reilly observed three women leave the house at 1908 Bronxdale Avenue, enter a car and drive off. They returned about 15 minutes later.

At about 9:15 p. m. Reilly and Spurdis observed a man leave the house under surveillance and enter a car. When they communicated this information to Pallatroni, he followed the departing car in his own vehicle. When the car appeared to be traveling in a circular route, Pallatroni and Reed ceased their surveillance and immediately returned to 1908 Bronxdale Avenue.[20]

Both Pallatroni and Reed testified, and we find plausible, that they then believed that this car was being used to "take the heat off" a major narcotics transaction by diverting surveillance officers away from the scene. Pallatroni testified that he had observed such diversionary tactics on prior occasions involving narcotics transactions.

Appellants contend that the log in evidence before Judge Brieant indicates that Officer Pallatroni checked on the registration of the vehicle which they had been following and knew that it belonged to Richmond and knew him to be an attorney. For this reason appellants claim that the officers could not have reasonably concluded that the car was a decoy. Even assuming that Officer Pallatroni was aware that the car belonged to Richmond, it would not follow that he thought that Richmond was driving the car and, in any event, the manner in which the car was being driven could have been taken by a reasonable man to have been suspicious. Attorneys, unlike Calpurnia, are not necessarily always above suspicion, even in narcotics cases.

Shortly after Pallatroni and Reed returned to the vicinity of 1908 Bronxdale Avenue, they were advised by Patrolman Reilly that two men had left the house and had sped off so as to prevent the officers from reading their license plates. At 9:30 p. m. Papa and DiNapoli (still unidentified) left the house at 1908 Bronxdale Avenue. Reilly radioed Pallatroni with the information that these two were leaving and that one of them was carrying with two hands what ap-

peared to be a very heavy suitcase. At first Reilly thought it was Papa who was carrying the suitcase, but as the two descended the steps of the building, he saw that it was the person who was later identified as DiNapoli.

Both DiNapoli and Papa entered the green dealer's Pontiac, putting the weighted suitcase on the back seat. Papa drove the car while DiNapoli was seated in the front passenger seat. Pallatroni and Reed immediately followed in their vehicle, having been informed by Reilly that Papa had left, and that the suitcase "appeared to be heavy."

After several blocks, the Reilly-Spurdis car took the lead position in the surveillance. When the green Pontiac took a turn, Pallatroni became apprehensive about losing it and instructed the lead car by radio to stop Papa's car. Spurdis pulled his vehicle alongside the Pontiac and Reilly held his badge out the car window (about an arm's length from Papa) and shouted to Papa to pull over. Spurdis drove his car in front of the Pontiac and Pallatroni stopped his car behind the Pontiac.

Papa left the Pontiac with DiNapoli and the suitcase inside and walked forward toward Spurdis and Reilly. Pallatroni concluded that this was designed to draw attention away from the car and its contents since most people remain in their cars when stopped by police officers. Under Pallatroni's instructions, Spurdis arrested Papa for violation of the federal narcotics laws. Pallatroni and Reed opened the door of the Pontiac, removed DiNapoli from the car and also placed him under arrest for violation of the federal narcotics laws. After searching DiNapoli for weapons, Pallatroni returned to the Pontiac where he observed Spurdis examining the open suitcase which had been placed on the street.

The sum total of events gave the officers observing 1908 Bronxdale Avenue on the night in question suffi-

---

**20.** The owner of the vehicle, Murray Richmond, an attorney, testified at the hearing that while he did not recall the drive on February

3, 1972, he may have missed a turn on the route which could have given the impression that he was driving in a circle.

cient reason to believe that a narcotics transaction was probably taking place. The fact that some of the officers' beliefs were later proved untrue in no way affects the issue of probable cause so long as the facts reasonably or sensibly led to the officers' conclusions of a probable offense, and these conclusions were "drawn by the light of the particular situation and with account taken of all the circumstances." Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). The facts in the present case fully justify a conclusion that probable cause existed to arrest DiNapoli and Papa.

Appellant DiNapoli also claims that even if there existed probable cause to arrest him, the officers should not have opened the suitcase in the back seat of the car without a search warrant. He argues that since upon his and Papa's arrest they were handcuffed, the possibility that either could obtain a weapon from or destroy the contents of the suitcase was eliminated. The appellants argue further that since the suitcase was opened after both Papa and DiNapoli were outside of the car, the suitcase was not in the area "within [the] immediately control" of either so as to justify a search under Chimel v. California, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

■■ While the Government would justify the search under United States v. Edwards, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), on the broad basis that arresting officers may properly take, examine and preserve for use "the personal effects of the accused," we need not go so far. Here the suitcase was "closely related to" the reason appellant was arrested and the reason the auto was stopped, see Cooper v. California, 386 U.S. 58, 62, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967), and there was probable cause to believe, as these officers did, that the suitcase contained contraband. The Supreme Court has made it clear, moreover, that a different set of rules prevails as to searches of automobiles (as opposed to homes or offices) "provided

that there is probable cause to believe that the car contains articles that the officers are entitled to seize." Chambers v. Maroney, 399 U.S. 42, 48, 90 S.Ct. 1975, 1979, 26 L.Ed.2d 419 (1970) (search for guns and stolen money); Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); but cf. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (police entering upon private property to seize and search unoccupied vehicle). Here there was, as we have said, probable cause to think that the suitcase in the auto contained narcotics. The fact that Papa and appellant DiNapoli had been apprehended makes no difference, United States v. Christophe, 470 F.2d 865, 868–69 (2d Cir.), cert. denied, 411 U.S. 964, 93 S.Ct. 2140, 36 L.Ed.2d 684 (1972), for to have taken the time to obtain a warrant to search a vehicle driven by one alleged to be a major narcotics trafficker like Papa near an intersection at night was to run risks not precisely foreseeable by the officers on the spot, but risks nevertheless; proof that contraband was in the suitcase moreover, might have led to further immediate police action back at 1908 Bronxdale Avenue. Cf. United States v. Ellis, 461 F.2d 962, 966 (2d Cir.), cert. denied, 409 U.S. 866, 93 S.Ct. 162, 34 L.Ed.2d 115 (1972). While, despite Chambers v. Maroney, supra, it may be argued that whenever matters sufficiently stabilize a warrant should be obtained, and the whole purport of the fourth amendment is to keep overzealous police conduct within bounds, see Amsterdam, Perspectives on the Fourth Amendment, 58 Minn.L.Rev. 349, 416 (1974), here the search was immediate, on-the-spot, and of a container reasonably thought to contain narcotics. United States v. Soriano, 497 F.2d 147, 149 (5th Cir. 1974) (en banc).

In the end, to find what is "reasonable" under the fourth amendment is our quest, United States v. Albarado, 495 F.2d 799 (2d Cir. 1974), and the somewhat elastic view of reasonableness taken by the Supreme Court in respect to searches of mobile autos compels us to a

conclusion favorable to the Government. *Compare* Chambers v. Maroney, 399 U.S. at 51–52, 90 S.Ct. 1975 *with* Cardwell v. Lewis, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974).

 Irrespective of the fourth amendment problems, the question still remains, of course, whether evidence of the money seized was relevant and otherwise admissible. We believe it was. DiNapoli had in June, 1971, less than eight months before the seizure, received $8,000–$10,000 of narcotics money from Pugliese at the Bronxdale Avenue house. Pugliese had told Pannirello that DiNapoli was in a narcotics partnership with "Vinnie," whom the jury could infer was Vincent Papa. Dilacio and Pannirello had taken over Pugliese's business in the autumn of 1971 and were buying heroin from DiNapoli at $21,000 per kilogram. The possession of large amounts of unexplained cash in connection with evidence of narcotics trafficking on a large scale is similar to the possession of special means, such as tools or apparatus, which is admissible to show the doing of an act requiring those means. *See* 1 J. Wigmore, Evidence § 88 (3d ed. 1940) at 516; *see* United States v. Bynum, 360 F.Supp. 400, 419 (S.D.N.Y.), aff'd, 485 F.2d 490 (2d Cir. 1973), vacated and remanded on other grounds, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974). Evidence of *sudden* acquisition of large amounts of money is also admissible to prove criminal misconduct when pecuniary gain, as here, is the basic motive. United States v. Jackskion, 102 F.2d 683, 684 (2d Cir.), cert. denied, 307 U.S. 635, 59 S.Ct. 1032, 83 L.Ed. 1517 (1939). As then Justice Holmes said in Commonwealth v. Mulrey, 170 Mass. 103, 49 N.E. 91, 94 (1898) (evidence of deposits too large to be accounted for by salary admitted), " . . . it is not necessary that every piece of evidence admitted should be sufficient by itself to prove the crime. Evidence which would be colorless if it stood alone may get a new complexion from other facts which are proved, and, in turn, may corroborate the conclusion which would be drawn from other facts." *See* 1 J. Wigmore, *supra* at § 154 at 601. *See also* United States v. Tirinkian, 488 F.2d 873 (2d Cir. 1973). The suggestion that here the large amounts of cash were from another illicit activity, loansharking, goes only to weight, not admissibility, of the evidence; if it represented proceeds from narcotics *and* loansharking the risk of its seizure and introduction was an ordinary business risk.

 The argument that so much cash · was so sensational, inflammatory and prejudicial as to outweigh its relevancy we find unimpressive. The argument suggests that the cash itself was in the courtroom, but it was made clear to us on argument that at most a photograph of the money was received. The recent case on which the argument is based, United States v. Falley, 489 F.2d 33 (2d Cir. 1973), is not in point; there a suitcase of odorous hashish and narcotics paraphernalia *unconnected* to the appellants Falley was held inadmissible; the conviction of their codefendant Stolzenberg, to whom the suitcase was linked, was affirmed.[21] United States v. Stolzenberg, 493 F.2d 53 (2d Cir. 1974). The fact that the sum of money was considerable is not so remarkable in this day and age as to make it per se inadmissible. United States v. Kenny, 462 F.2d 1205 (3d Cir.), cert. denied, Murphy v. United States, 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972) (possession of $2,000,000).

## II. *A single conspiracy.*

 In an effort to establish a variance between the charges in the indictment and the proof adduced at trial, the appellants, all of whom were found guilty on the conspiracy count, argue that the indictment charged only a single conspiracy while the evidence proved

---

**21.** United States v. Williams, 168 U.S. 382, 42 L.Ed. 509 (1897), heavily relied on by appellant DiNapoli, has been sharply criticized by Wigmore, *supra* § 154 n. 1 at 601 and limited to its facts in Judge Patterson's United States v. Jackskion, 102 F.2d 683, 684 (2d Cir.), cert. denied, 307 U.S. 635, 59 S.Ct. 1032, 83 L.Ed. 1517 (1939).

the existence of two independent and competing conspiracies, one headed by Inglese and Tramunti and the second run by DiNapoli and Pugliese. Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Appellants argue that the Government failed to show sufficient indicia of criminal partnership such as commingling of assets, a common headquarters or substantial mutual dependence between the two groups, to permit them to be linked together as a single operation. See United States v. Mallah, 503 F.2d 971, 976 (2d Cir. 1974). We disagree. While much of the evidence did indicate that there were two spheres of operation in the narcotics conspiracy that was established, there was sufficient proof of mutual dependence and assistance to warrant treatment of the two spheres as one general business venture.

The testimony of Barnaba is of particular importance in establishing the connection between the Inglese and DiNapoli/Pugliese operations. Barnaba worked for both groups, and while he apparently never distributed for both operations at the same time, it is significant that he could move from one organization to the other with relative ease. Barnaba's move from the Inglese operation to that headed by DiNapoli/Pugliese (a move facilitated by social contacts at the Beach Rose Social Cub and elsewhere between the two organizations) indicated that these were not independent competitors. Barnaba was accepted into the DiNapoli operation with complete trust. While he worked with Inglese he was required to pay in advance for drugs to be purchased; however, from the start he was allowed to get substantial amounts of drugs from DiNapoli's operation on consignment. This may be taken as evidence of mutual trust and cooperation between the operations and indicative of the link between them.

In addition, the involvement of DiNapoli's partner, Angelo Mamone, see note 12 supra, in the Inglese operation further evidenced the groups' interrelationship. Mamone vouched for Barnaba's customer Forbrick in connection with Inglese's operation. Similarly, Mamone resolved a dispute that Barnaba, then a customer of Inglese's was having over some heroin which Inglese had furnished to Barnaba. Finally, on an occasion in November, 1970, at the Beach Rose Club Inglese called Mamone to count money that Barnaba had received as advance payment from Forbrick for narcotics.

Thirdly, DiNapoli's partner Pugliese had knowledge of intimate details regarding the Inglese operation. After Barnaba had left Inglese and come to work for DiNapoli, Pugliese pointed out in the street a man whom he identified as one of Inglese's customers. Barnaba said he had previously seen the man deliver boxes to Inglese at the Beach Rose Social Club. Pugliese's reply was, "Them boxes were full of money."

Lastly the two organizations were linked by sales to common distributors.[22] While this alone would not prove a single conspiracy, the cumulative effect of all of the above is to tend to demonstrate the existence of a single conspiracy linked together by cooperation, trust and a mutual source of supply.[23] In

---

**22.** Barnaba made sales to Burke with drugs supplied by Inglese and Burke was a "customer" of Mamone; while Barnaba testified that Mamone "didn't say what [Burke] was a customer for" we think that in the overall context of the evidence the jury could properly infer that he was a narcotics customer. DiGregorio, a courier for the DiNapoli/Pugliese operation, also received drugs from Forbrick who had received his drugs from Inglese by way of Barnaba.

**23.** There was evidence that through Ralph "The General" Tutino, Inglese sought to buy

12 "packages" (kilograms of heroin) from Papa; he said this in front of Barnaba to appellant Christiano, but that Inglese thought "the General" would "get nothing from him, that guy is nasty, you can't even talk to him." Subsequently Pugliese, who was close enough to Papa to call him "Uncle," apparently because he (Pugliese) had once "pulled a car off a ship for him" with 10 kilos of heroin in it, told Barnaba that Inglese asked him (Pugliese) to get a "package" from Papa for him. Pugliese went on to say that Inglese "was drowning, and 'He wants me to go down with him.' " Appellants argue that all this goes to show

light of all the evidence, the jury was entitled to find as it did, that the defendants belonged to a single loosely-knit conspiracy. United States v. Mallah, *supra*, at 984; United States v. Arroyo, 494 F.2d 1316 (2d Cir.), cert. denied, 419 U.S. 827, 95 S.Ct. 46, 42 L.Ed.2d 51 (1974); United States v. Bynum, 485 F.2d at 495. *See also* United States v. Cirillo, 468 F.2d 1233 (2d Cir. 1972), cert. denied, 410 U.S. 989, 93 S.Ct. 1501, 36 L.Ed.2d 188 (1973).

Appellants object to the charge on multiple conspiracies as wrong, contradictory and confusing. The charge on multiple conspiracies was the same as the one approved in United States v. Bynum, 485 F.2d at 497, except that the court avoided that part of the charge challenged in *Bynum, supra,*[24] by saying:

Proof of several separate conspiracies is not proof of the single, overall conspiracy charged in the indictment unless one of the several conspiracies which is proved is the single conspiracy which the indictment charges. What you must do is determine whether the conspiracy charged in the indictment existed between two or more conspirators. If you find that no such conspiracy existed, then you must acquit. However, if you are satisfied that such a conspiracy existed, you must determine who were the members of that conspiracy.

If you find that a particular defendant is a member of another conspiracy, not the one charged in the indictment, then you must acquit that defendant. In other words, to find a defendant guilty you must find that he was a member of the conspiracy charged in the indictment and not some other conspiracy.

We think the charge clear, correct and within the decided cases. By saying that

In determining whether any defendant was a party, each is entitled to individual consideration of the proof respecting him or her, including any evidence of his or her knowledge or lack of knowledge, his or her status, his or her participation in key conversations, his or her participation in the plan, scheme or arrangements alleged,

and marshaling the evidence as to each defendant,[25] it was clear to the jury that acquittal was required if there was insufficient proof of participation in the "single, overall conspiracy" charged. The request (*e. g.*, of appellant Christiano) to charge that if multiple conspiracies had been proven then the Government has failed to prove the single conspiracy alleged in the indictment and there must be acquittal, fails to take into account the very real possibility that *one* of the proven conspiracies was the single conspiracy charged.[26] While there is lan-

---

two conspiracies and considerable lack of mutual direction or even mutual relationship, but this goes only to weight. The jury may have preferred to think that as the principal source of supply Papa wanted either the top dollar for his product or had worked out some more favorable relationship with DiNapoli. The evidence of Pugliese's cheating the latter by putting some money in a sock is indicative that in this business honorable dealing with one's associates is not the highest ethic.

**24.** In *Bynum* the court below charged that "if you find that the Government has failed to prove the existence of only one conspiracy you must find the defendants not guilty." This was held, 485 F.2d at 497, not to be a prejudicial "all or nothing" charge condemned in United States v. Borelli, 336 F.2d 376 (2d Cir. 1964), cert. denied, Mogavero v. United States,

379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965), since it was made "perfectly clear to the jury that if each of the defendants was not a knowing participant in the single conspiracy he must be acquitted."

**25.** Only Mamone complains of this marshaling upon appeal. Mamone complains that the court's summary of the evidence unfairly omitted reference to his claim that his frequent attendance at the Beach Rose Social Club was for gambling purposes. This was a matter within the court's discretion, however, United States v. Tourine, 428 F.2d 865, 869 (2d Cir. 1970), and with over 5,000 pages of testimony in an eight-week trial where the judge neither acted as advocate nor sought to impose his own opinions on the jury, we find no error.

**26.** That the proof may have necessarily included evidence of at least one other conspiracy

guage in United States v. Calabro, 449 F.2d 885, 894 (2d Cir. 1971) that "it is better practice to instruct the jury that they must acquit if they find multiple conspiracies when only one conspiracy is charged," the decision was that a failure so to charge is not error where the charge examined as a whole stresses that there must be finding of the single conspiracy charged and individual knowing participation by each individual in it. *Id.* Our examination of Judge Duffy's charge as a whole indicates that he laid sufficient stress on these elements although the factual pattern here was more complex than in *Calabro, supra.* *Kotteakos, supra,* it will be recalled, involved a situation in which "the jury could not possibly have found, upon the evidence, that there was only one conspiracy." 328 U.S. at 768, 66 S.Ct. at 1249. In that situation, where only separate and distinct conspiracies are shown, and the single conspiracy alleged is not proven, acquittal is required and the request must be given. Here, however, where there was proof of the single, overall conspiracy, the fact that there also was evidence adduced of other conspiracies or that the jury could have found two *major* conspiracies does not require a mandatory charge of acquittal.

### III. *Sufficiency of the evidence.*

Appellants DiNapoli, Mamone, Gamba and Tramunti each claim that the evidence was insufficient to warrant his conviction(s). Appellants Salley and Alonzo each claim the evidence showed him only to have engaged in a single act, establishing neither knowledge of nor participation in the charged conspiracy. Appellant D'Amico claims that the evidence was insufficient to convict him on the substantive count. The remaining appellants, while incorporating the arguments of all other appellants, do not contend that the evidence was insufficient as to them.

■ A. *DiNapoli.* DiNapoli's argument is that, absent hearsay, there was insufficient evidence to convict him on either the substantive or conspiracy counts. *See* United States v. Cirillo, 499 F.2d 872, 884–86 (2d Cir. 1974); United States v. D'Amato, *supra;* United States v. Manfredi, 488 F.2d 588 (2 Cir. 1973), cert. denied, 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974). Pannirello and Pugliese, then in the narcotics business, it will be recalled went to 1908 Bronxdale Avenue where Pugliese, after secreting some money in a sock, delivered $8,000 to $10,000 to DiNapoli in Pannirello's presence. DiNapoli argues that this could have been loansharking money and that it is "sheer speculation" to suggest that it was narcotics proceeds. This is similar to the bookmaking argument made by the appellant in United States v. Mallah, 503 F.2d at 975, but held insufficient by this court. Here, however much DiNapoli may have also been engaged in loansharking, there was no evidence or indication that Pugliese was in that line of criminal endeavor. The jury could infer from the delivery of the money by Pugliese that it was from narcotics, since he was accompanied by Pannirello, his partner in that business; the jury could also infer from DiNapoli's failure to count the money that Pugliese was an underling, delivering to his boss. Neither of these inferences had to be drawn, but both could have been. The fact that DiNapoli associated with Pugliese both at 1908 Bronxdale Avenue and at the Beach Rose Social Club, while

---

does not change the situation: evidently there was evidence that Lessa bought both from Papa and from Lentini, who in turn had bought from Jack Spada, a worker for Herbert Sperling. United States v. Sperling, 506 F.2d 1323 (2d Cir. 1974), (Gov't Brief at 36–40). So too Papa is not exactly a stranger to Second Circuit narcotics annals in connection with other ongoing conspiracies. *See* United States v. D'Amato, 493 F.2d at 365 n. 4. With regard

to a big business which lacks open operation, let alone registration or regulation, lines of corporate or partnership distinction are difficult to draw; in the context of narcotics network cases, seemingly clearcut principles of criminal law are by no means easy to apply. If a court does not lean over backward to blaze new pathways of individual nonresponsibility in hard drug cases, the result is not necessarily bad law.

neutral as such, United States v. Di Re, 159 F.2d 818 (2d Cir. 1947), aff'd, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948), takes on color in light of the money delivery and confirms the likelihood of the established business relationship. The possession and removal in the night from 1908 Bronxdale Avenue of the $960,000 in $50 and $100 bills, as we have pointed out above, was relevant to establish illicit activity. In the light of Pugliese's payment over of what the jury could infer to have been narcotics proceeds in the same place, the $960,000 could also be taken to be at least in substantial part narcotics proceeds. This was enough to establish membership in the conspiracy under United States v. D'Amato, 493 F.2d at 362–65, *Manfredi, supra,* and their predecessors, *e. g.,* United States v. Geaney, 417 F.2d 1116, 1120 (2d Cir. 1969), cert. denied, Lynch v. United States, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). With that established, and the hearsay therefore admissible, concededly there is sufficient evidence on the conspiracy count.

As to the substantive count (Twenty-one), it charged that DiNapoli and Dilacio distributed heroin on or about December, 1971. Pugliese had told Pannirello and Dilacio that the latter was going to pick up the narcotics from Joseph DiNapoli and Pannirello was to make the deliveries. After Dilacio and Pannirello "decided to get in touch with DiNapoli to see if we can get some more narcotics from him," Dilacio told Pannirello that he had called DiNapoli and the latter "was going to give him a kilo" for $22,-000. On "[t]he night Pat Dilacio picked up the kilo from DiNapoli," Pannirello went to Gamba's house, which was the "stash," and received a kilo in the form of two packages in a suitcase from Dilacio who said "it was still standing the same," *i. e.,* could be cut four times. Pugliese's and Dilacio's statements were admissible as verbal acts, *D'Amato, supra,* showing a plan to buy narcotics from DiNapoli; the narcotics were bought, were of the same high quality as previously supplied to Pugliese for distribution by Dilacio and Pannirello, and it could be inferred that the plan had been carried out. United States v. Annunziato, 293 F.2d 373, 377 (2d Cir.), cert. denied, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134 (1961). While there was a standing objection to hearsay admitted subject to connection on the conspiracy, Pannirello's assertion that "Dilacio picked up the kilo from DiNapoli" was not objected to as lacking foundation or otherwise and since it was not in form hearsay may be taken as fact found by the jury. We therefore reject DiNapoli's argument.

■ B. *Mamone.* Appellant Mamone argues that the Government's proof was only that he associated and had incidental contacts with some of the conspirators, and that the evidence was therefore insufficient. United States v. Bufalino, 285 F.2d 408, 417–18 (2d Cir. 1960). He was, he claims, at most a "casual facilitator." *See* United States v. Jones, 308 F.2d 26, 30 (2d Cir. 1962). His "casual facilitation," however, included helping Inglese count narcotics proceeds, vouching to Inglese for Forbrick's reliability, and resolving a dispute between Burke and Barnaba over the quality of narcotics sold to the former. While Mamone's role was somewhat shadowy, there was enough to permit introduction of the hearsay declaration by Dilacio to Barnaba that since Dilacio was unable to get narcotics from DiNapoli at some point in December, 1971, he was "trying to see his [DiNapoli's] partner, Butchie [Mamone]." Mamone's frequent attendance at the Beach Rose Club taken in this light may have been inferred to be for business reasons. His relationship with both of the main branches of the conspiracy, as we have said, is one of the strongest indicators that there was one overall conspiracy rather than two entirely separate conspiracies.

■ C. *Gamba.* Appellant Gamba, nicknamed "Sinatra," argues that there was no evidence of his knowledge of and intention to participate in a conspiracy of the scope alleged in the indictment. While admittedly on three or four occasions during a six-month period he al-

lowed his apartment to be used as a place to hide or "stash" heroin, he argues that there was no proof that he knew of the scope of the conspiracy or the conspirators (except for Pannirello, Provitera and possibly Pugliese). He forgets that he also dealt directly with Dilacio who brought heroin from DiNapoli to Gamba's house, that he was introduced to Pannirello by Pugliese who had used Gamba's house as a "stash" before, and that he received $300 a week for four or five months for permitting his house to be used for storing drugs by Dilacio and Pannirello, this on Pugliese's orders. It would not take a great deal of imagination for Gamba to have considered that someone was selling to Pugliese's henchmen, and that they in turn were distributing to someone else, even if he was not in on all the details, scenarios and players in the cast. As such, it may be that the others did not want him to know so much that he could "sing," but that does not any the less make him a member of the conspiracy. As we recently said in United States v. Ortega-Alvarez, 506 F.2d 455 (2d Cir. 1974), "when large quantities of heroin are being distributed, each major buyer [or we would add "stash"] must be presumed to know that he is part of a wide-ranging venture, the success of which depends on the performance of others whose identities he may not even know." While we might not use the phrase "presumed to know," we will settle for "may be taken by the jury to have known."

D. *Tramunti.* Carmine Tramunti has not had his role in this conspiracy discussed previously in this opinion. His connection with the case is not as strong as some of the others', but when analyzed is still beyond the borderline of sufficiency. The connection rests on conversations overheard or participated in by Frank Stasi, who, it will be recalled, first worked as a steward at the Beach Rose, where he saw Inglese almost daily, and did some selling, storing and mixing for him. Stasi overheard the first of these conversations when, on his way to the men's room at the Lo Piccolo,

he walked by Inglese (Gigi) and Tramunti; the former told the latter, "I expect some goods. I am going to need some money." Tramunti nodded his head and they stopped talking as Stasi walked by, except that Inglese told Stasi, "I want to see you, I want to talk to you." After the trip to the men's room, this was altered to "I will see you tomorrow." A couple of days later, Stasi again encountered Inglese who said, "I expected some goods and I didn't get it." There was evidence that Inglese used the words "goods" generally to refer to heroin, which is what he was wholesaling. Whether Tramunti knew that is what he meant does not appear in evidence.

A short time later, Stasi accompanied Vincent ("Vinnie") DiNapoli, brother of Joseph, and Tramunti (who was known as "the old man") to a bistro with the unlikely name of the "Tear Drops Bonsoir" to hear drummer Buddy Rich. After parking the car Stasi joined them at a table with Vinnie DiNapoli's wife, brother Anthony DiNapoli and his girlfriend and two "unescorted females." After some drinks, Tramunti said to Stasi, "I miss the big guy. Without him nothing goes right. You know, the club, there's nothing happening in the club." The "big guy" Tramunti specifically said was "Gigi," *i.e.,* Inglese. Stasi said, "All right, I will go and see him." Stasi did so the next day at the jail in which Inglese was then incarcerated. After casual conversation as to "What's happening outside," a reference to narcotics cohorts DelVecchio and Christiano, and Inglese's saying, "Geez, I wish something happens. This way we could get some money." Stasi said, "You know I seen Carmine about the club and he says about the conversation about the money, yes or no, you would know." Inglese replied, "If you don't know what's happening, I don't know. Just say no." As a result of this converstion, Stasi went to the Lo Piccolo and he told Tramunti, who was watching the card players, "I went to see Gigi. He told me no about the conversation." Tramunti replied, "All right I guess nothing is happening."

Taken with the previous conversation at the Lo Piccolo and the fact that Inglese had been seriously engaged in the narcotics business, the inference is permissible that Tramunti was at least interested in Inglese's business, if not a financial backer of it. Even so, with just these conversations in mind, there is still no direct tie of Tramunti to Inglese's business or furtherance of its objects, and no proof beyond a reasonable doubt that "goods" meant narcotics to Tramunti or that the phrase "what's happening at the club" or "what's happening" or "nothing's happening" had reference to the narcotics business.

It is not until a subsequent conversation that the direct tie occurs, but it is there, and it is plain, and it casts the previous conversations in their worst light from Tramunti's point of view. At the Lo Piccolo, Stasi heard Inglese tell Tramunti that "We are having a problem getting Moe Lentini out of prison."

The problem in terms of Lentini was not in raising the $75,000 bail necessary to get him out of prison but in providing property as collateral. Tramunti told Inglese to "Try to get him out" but that as to the property, "There's nothing I can do about that." Inglese then remarked to Stasi in Tramunti's presence that "Jeez, I'd like to get him out, because its important to the organization because Joe Crow [DelVecchio] right now can't do anything [he was in Inglese's phrase "hot"], and he's [Lentini is] very good with figuring and mixing. So we've got to try to get him out." The jury may well have considered that the statement "we've got to try to get him out" was directed at Tramunti.

No matter how naive Tramunti would have himself taken to be in reference to the jargon-meanings of "goods" and "what's happening," he learned or knew from this conversation that Lentini was (a) "important to the organization," (b) because he was "very good with figuring and mixing." The inferences that the "organization" was engaged in narcotics because a man who was good at "figuring and mixing" or cutting drugs was

important to it is just about irresistible, assuming Stasi was to be believed, which of course we must do. The fact that Tramunti told Inglese to "try to get him out" specifically points up his role as Inglese's boss or partner.

It is interesting that Inglese told Stasi to pacify Lentini's girlfriend, Donna, and that when he went to her house he spoke directly to Lentini on the phone at the West Street federal detention center. Lentini asked whether Stasi could get him out, and when the latter replied that he had no way even of getting himself out if anything happened, Lentini inquired, "What about the old man? Can he do anything." Stasi said, "We just had that conversation now about trying to get you out. Gigi told me to tell you, to tell Donna, but being that I got you on the phone, the old man has someone with property. He'll try to get you out." Lentini was shortly released on bail.

We hold the sum total of these conversations sufficient to permit the jury to infer that Tramunti was a director or higher-up in the "organization," one pretty well shielded to be sure from its day to day operations, but one to whom Inglese, a higher-up, considered himself responsible; that Tramunti was on occasion looked to as a source of funds for organization purchases or bail; and that he was concerned when Inglese's business was slow. This is enough to permit him to have been found a coconspirator. United States v. Manfredi, *supra*; United States v. Ruiz, 477 F.2d 918, 919 (2d Cir.), cert. denied, 414 U.S. 1004, 94 S.Ct. 361, 38 L.Ed.2d 240 (1973); United States v. Calabro, *supra*.

E. *Salley and Alonzo.* Appellants Salley and Alonzo each claim that he was engaged only in a single transaction which does not permit an inference of agreement on his part to enter the overall conspiracy. We have said numerous times that a single act may be sufficient for an inference of involvement in a criminal enterprise of substantial scope at least if the act is of a nature justifying an inference of knowledge of the broader conspiracy. United States v.

D'Amato, 493 F.2d at 365; United States v. DeNoia, 451 F.2d 979, 981 (2d Cir. 1971). While we recently pointed out that the conflicting line of authority in "single act" cases is explicable on the basis of "the qualitative nature of the act or acts constituting the single transaction (purchase, delivery or the like) viewed in the context of the entire conspiracy"[27], United States v. Torres, 503 F.2d 1120, 1124 (2d Cir. 1974), we have also said that "when large quantities of heroin are being distributed, each major buyer must be presumed to know that he is part of a wideranging venture, the success of which depends on the performance of others whose identities he may not even know." United States v. Ortega-Alvarez, 506 F.2d at 457; United States v. Mallah, 503 F.2d at 984.

 Salley was introduced by Warren Robinson to Provitera and Pannirello as his "man" in October, 1972; Robinson told Provitera to make future deliveries of heroin destined for District of Columbia distribution to Salley. This he did two weeks later. Subsequently at the same route 46 Howard Johnson's Salley notified the pair that Robinson was on his way; Salley was later present when Robinson gave Pannirello $19,000 in cash, complained about quality and negotiated for more drugs. We think the evidence sufficient that Salley, while a minor player, perhaps, was an agent or alter ego for a major buyer and as such sufficiently knowledgeable of the overall conspiracy to be considered a member of it. For the narcotics business to work it takes distributors as well as suppliers, mixers and middlemen.

 Alonzo, Hattie Ware's brother and also known as "Butch" Ware, bought two ounces of conspiracy heroin from Pannirello at Hattie Ware's apartment, saying "he wanted to get rolling again" and wanted "to start off small" because he didn't have any money. He took the two ounces on consignment and was to pay $2,000 for it. He never completed payment for it, paying no more

than $1,600. He never bought any more. He was not a "major buyer," or working for one. We think he is entitled to the benefit of the single act line of cases, led by United States v. Reina, 242 F.2d 302, 306 (2d Cir.), cert. denied, 354 U.S. 913, 77 S.Ct. 1294, 1 L.Ed.2d 1427 (1957), the one most specifically in point being United States v. Aviles, 274 F.2d 179, 190 (2d Cir.), cert. denied, Evola v. United States, 362 U.S. 974, 80 S.Ct. 1057, 4 L.Ed.2d 1009 (1960). *See also* United States v. DeNoia, 451 F.2d 979 (2d Cir. 1971). This was a large, multi-party conspiracy extending over a period of years. Alonzo's dealings were on one occasion only, with a lesser figure, for a small amount. Viewed in the entire context of the conspiracy his act qualitatively is minuscule. True, he indicated that he had been a dealer before and that he wanted to start dealing again, but he made no other purchase. True also, he was present at the apartment when Pannirello made a delivery to Basil Hansen, but presence alone is not enough. *See* United States v. Terrell, 474 F.2d 872, 875–76 (2d Cir. 1973). When the Government throws out its big conspiracy net to catch the big fish in the criminal sea, it has to be aware that an occasional minnow may wriggle free.

 F. *D'Amico.* D'Amico urges that the evidence was insufficient to convict him on the substantive count apparently because Stasi, testifying to a $7,000 sale of heroin, erroneously remembered that it was November, 1972, as alleged in the indictment, rather than February, 1973, that he came to D'Amico's apartment. We fail to see the prejudice in this variance, however, and therefore find the evidence sufficient; the discrepancy in terms of amount of drug purchased is likewise immaterial.

IV. *The sufficiency of the Government's pretrial disclosure.*

Appellant Mamone contends that the Government failed to disclose adequately in the indictment and bill of particulars

---

**27.** This is to say that in a small conspiracy, the evidentiary value of a "single act" in inferring knowledge of the conspiracy is greater than it would be in a broad conspiracy.

the proof it would present to link him to the conspiracy, thereby denying his sixth amendment rights. Specifically he complains that he was not informed that the Government would offer evidence at trial relating (1) to the alleged assistance he provided to Barnaba with respect to problems with the latter's customer, Burke; (2) to the comments by Dilacio to Barnaba identifying Mamone as Joseph DiNapoli's business partner; and (3) to Mamone's willingness to vouch for Forbrick in connection with narcotics purchases made through Inglese. He argues that he had no opportunity to investigate the reliability of the Government's case.

 While neither the indictment nor the bill of particulars in the present case developed in great detail the nature of Mamone's participation in the conspiracy, that is not required. An indictment need only provide sufficient detail to assure against double jeopardy and state the elements of the offense charged, thereby apprising the defendant of what he must be prepared to meet. United States v. Salazar, 485 F.2d 1272, 1277 (2d Cir. 1973), cert. denied, 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974). Under this test, an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime, United States v. Fortunato, 402 F.2d 79, 82 (2d Cir. 1968), cert. denied, 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463 (1969); United States v. Palmiotti, 254 F.2d 491, 495 (2d Cir. 1958), although in the case of a conspiracy it has been held that at least one overt act must be set forth. Cf. United States v. Grunewald, 353 U.S. 391, 396–97, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957); United

States v. Luros, 243 F.Supp. 160, 168 (D.Iowa 1965).[28] Here the indictment followed the language of the conspiracy statute, stated in broad terms the time and place of the crime, and specified some 17 overt acts in furtherance of the crime. The Government was not required to provide in the indictment a detailed statement of all the parties with whom Mamone was alleged to have had dealings during the term of the conspiracy. United States v. Rosa, 343 F.2d 123, 124 (2d Cir. 1965); United States v. Spada, 331 F.2d 995, 996–97 (2d Cir.), cert. denied, 379 U.S. 865, 85 S.Ct. 130, 13 L.Ed.2d 67 (1964).

The bill of particulars prepared by the Government elaborated upon the statement in the indictment that Mamone was present at the Beach Rose Social Club in November of 1970 by stating that the Government intended to show that at that time Mamone assisted Louis Inglese in counting the proceeds from a narcotics transaction. Further particularization was not necessary. See United States v. Carroll, 510 F.2d 507, 509 (2d Cir. 1975). In fact, Mamone is unable to demonstrate that an elaboration of the bill of particulars would have been helpful to him in preparing his defense since the evidence which the Government did not disclose to him involved individuals who could not have assisted in that defense: Dilacio was a fugitive, Forbrick had suffered a stroke, and Burke was dead.[29]

 Under all of these circumstances, it seems clear that Mamone was not prejudiced in connection with the Government's somewhat limited bill of particulars here. "Whether a bill of particulars should be provided at all, its

**28.** In fact, the Government may not have been required to prove an overt act in this conspiracy; there is authority to the effect that proof of an overt act is not a necessary element of a conspiracy charged under 21 U.S.C. § 846. Ewing v. United States, 386 F.2d 10 (9th Cir. 1967), cert. denied, 390 U.S. 991, 88 S.Ct. 1192, 19 L.Ed.2d 1299 (1968); Leyvas v. United States, 371 F.2d 714 (9th Cir. 1967); United States v. Garfoli, 324 F.2d 909 (7th Cir. 1963); United States v. DeViteri, 350 F.Supp. 550

(E.D.N.Y.1972); United States v. Gardner, 202 F.Supp. 256 (N.D.Cal.1962).

**29.** Mamone's brief states that Burke was killed in a domestic quarrel; the record of this case contains no such information. In any event, it seems clear that by Mamone's admission it would not have been helpful for the Government to have provided Mamone with information concerning his involvement with Barnaba and Burke.

scope and specificity, if permitted . . are all matters left primarily to the discretion of the trial judge." United States v. Salazar, 485 F.2d at 1277–78. *See* Wong Tai v. United States, 273 U.S. 77, 82, 47 S.Ct. 300, 71 L.Ed. 545 (1927).

### V. *The voir dire examination.*

■ Appellant Gamba argues that the trial court's voir dire examination was improper in two respects. First, he contends that the questioning of prospective jurors on the possibility of bias in a case involving narcotics was not as extensive as it should have been. Specifically he argues that jurors should have been questioned regarding narcotics use by themselves, their relatives or close friends in order to uncover possible hidden prejudices that they may have had against' the appellants.

■ This argument fails. The trial judge has considerable discretion in conducting the voir dire. In almost any case there can be developed a series of questions designed to uncover some possible juror prejudice, but the orderly functioning of the judicial process requires that the trial court be allotted some flexibility to place reasonable limitations on juror examination. United States v. Zane, 495 F.2d 683 (2d Cir. 1974); United States v. Ruggiero, 472 F.2d 599 (2d Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2772, 37 L.Ed.2d 398 (1973); United States v. Colabella, 448 F.2d 1299, 1303 (2d Cir. 1971), cert. denied, 405 U.S. 929, 92 S.Ct. 981, 30 L.Ed.2d 803 (1972). *But cf.* United States v. Grant, 494 F.2d 120 (2d Cir. 1974); United States v. Dellinger, 472 F.2d 340 (7th Cir. 1972), cert. denied, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973). Our examination of the record in this case discloses that in addition to broad questions regarding juror bias, the trial judge specifically asked whether the jurors would be prejudiced because this case involved narcotics, and whether the jurors or their families had been the victims of a crime. He was required to do no more in respect to narcotic use by family or friends. *Cf.* United States v. Bradley, 447 F.2d 224 (2d Cir.), cert. denied, 404

U.S. 947, 92 S.Ct. 303, 30 L.Ed.2d 263 (1971).

■ Appellant Gamba also assigns as error the trial judge's refusal to allow his challenge for cause of a juror who, after the jury was sworn but before testimony was taken, informed the court that his wife's stepson had become an addict *after* he and his wife had separated. While there is some confusion in the record regarding the closeness of the juror's relationship to his wife's stepson, the juror was firm in his statement that he would not be influenced in this case by his wife's stepson's addiction. As this court stated in United States v. Ploof, 464 F.2d 116, 118 n. 4 (2d Cir. 1972),

> There are few aspects of a jury trial where we would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in ruling on challenges for cause in the empanelling of a jury.

Here there is no proof of clear abuse by the trial judge. When questioned by the trial judge, all indications pointed to the conclusion that the juror was convinced that he would not be influenced by his wife's stepson's addiction in deciding this case, and that the only reason the juror raised the issue was in an attempt to perform his duties scrupulously.

### VI. *The admissibility of the photograph of appellant Hattie Ware.*

Appellant Hattie Ware contends that a photograph seized in the search of Basil Hansen's apartment was obtained in violation of her constitutional rights. Her claim focuses on an interrogation which led to the seizure.

On October 3, 1973, appellant Ware was arrested pursuant to a valid warrant, and at that time was given proper warnings under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Later that same day, she was again advised of her constitutional rights and then questioned on her participation in the sale of narcotic drugs. During the questioning, she was asked about various addresses and telephone numbers found in her pocketbook, and she willingly identified all but one of these.

When she refused to identify this one address and telephone number, she was asked if they belonged to Basil Hansen. At this point, appellant Ware began to cry. In the light of this refusal to respond, Government agents went to the address and found a number of items relevant to their investigation including pictures of appellant Ware socializing with appellant Pugliese.

Under all of these circumstances, there is no merit to appellant's claim that her constitutional rights were violated in a situation where the police acted upon her refusal to identify an address which she had in her possession.

■■■■■■ Under *Miranda*, in the light of appellant's right to refuse to answer the agents' questions, not only any answers elicited from her after she expressed an unwillingness to continue would be inadmissible but also the interrogation must stop. 384 U.S. at 473–74, 86 S.Ct. 1602. But *Miranda* does not prevent the interrogating officer from drawing reasonable inferences from the behavior of the person being questioned, in this case, a refusal to answer specific questions asked her by the Government agents after responding to others. The refusal to identify the number, altogether aside from the repetition of the question and accompanying tears, was itself sufficient to provide probable cause for the agents to search the apartment. The improper subsequent interrogation and the tears cannot be deemed to "taint" the previous inference drawn.

VII. *The issuance of a bench warrant for appellant Springer and the introduction of narcotics seized upon the execution of the warrant.*

■■■■■■ Appellant Springer claims that the bench warrant issued for his appearance in court on December 3, 1973, was both insufficient on its face and issued in an abuse of the trial judge's authority. In addition, he argues that certain narcotics and related paraphernalia which were seized at his home when the bench warrant was executed were seized illegally and should not have been received

in evidence. The issuance of the bench warrant was not an abuse of discretion. The warrant was issued when, after receiving notification, Springer failed to appear in court on December 3, 1973; its issuance, however, was surely influenced by the fact that on at least two prior occasions Springer had similarly failed to appear for scheduled pretrial conferences.

■■■■ As for the sufficiency of the warrant, the appellant argues for the first time on appeal that the warrant was improperly drawn and therefore invalid since it incorrectly stated that there was pending an indictment charging him with jumping bail (rather than with a violation of the federal narcotics laws). This error, apparently a clerical one, in no way voids his arrest. He was named in an indictment, he was properly notified, and a bench warrant was properly issued for his appearance. The fact that the warrant referred to the wrong charge does not make it invalid here. *Cf.* United States v. Pisano, 193 F.2d 361, 363–64 (7th Cir. 1951).

■■■■■■ Appellant has raised the question of the sufficiency of the warrant in an effort to invalidate the seizure of a quantity of drugs found in his apartment when the warrant was executed. When the officers went to Springer's apartment pursuant to the warrant and the door was opened, however, they saw Springer standing behind a counter with white powder and aluminum foil on it, apparently mixing heroin. His arrest was thus proper as for a felony committed in the officers' presence even without a valid warrant. It follows also that the seizure of the narcotics would have been proper under the "plain view" doctrine. Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); United States ex rel. Williams v. LaVallee, 415 F.2d 643 (2d Cir. 1969), cert. denied, 397 U.S. 997, 90 S.Ct. 1139, 25 L.Ed.2d 406 (1970).

■■■■■■ Springer's arguments concerning the admissibility of the drugs and related paraphernalia are little more convincing. Springer contends that this "real"

evidence was irrelevant to the charges contained in the indictment since it was seized from him after the termination of the conspiracy. The drugs were admitted, however, only with the limiting instruction that they were not to be considered by the jurors in connection with the conspiracy count. This instruction may well have been to the benefit of the appellant, since there is precedent to the effect that the narcotics seized after the termination of the conspiracy were admissible to show the existence of the conspiracy, since conduct of a conspirator, not consisting of a hearsay declaration, is admissible to prove the existence of the conspiracy even though occurring after the termination of it. *See* Anderson v. United States, 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 21 (1974); United States v. Bennett, 409 F.2d 888, 892 (2d Cir.), cert. denied, 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed.2d 101 (1969). *But see* Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (hearsay declaration inadmissible). In addition, the drugs were admissible as proof of similar subsequent conduct by Springer tending to show intent or state of mind with respect to the conspiracy in question, which was the basis on which the court below admitted them. United States v. Mallah, 503 F.2d at 981; United States v. Cohen, 489 F.2d 945, 949 (2d Cir. 1973).

Springer also maintains that the evidence was not sufficiently connected to him to have been admitted against him, but in light of the facts surrounding the seizure, which indicated that Springer was apprehended while in the process of diluting heroin, this argument is wholly unconvincing.

### VIII. *The in-court identification of appellant Salley.*

■■■ Appellant Salley contends that an in-court identification made by the Government witness Provitera should have been ruled inadmissible because it was tainted by a prior identification of Salley by Provitera in an impermissibly suggestive photo display. The photograph display was as Salley contends quite clearly suggestive since the photograph of Salley contained in the photo spread was much larger than any of the other 18 photos and additionally was the *only* picture which was not a mug shot. But under Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), for an in-court identification to be inadmissible the prior identification must have also been of such a nature to give rise to a "substantial likelihood of irreparable misidentification" when considered in the light of the "totality of the circumstances." Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); United States v. Evans, 484 F.2d 1178, 1185 (2d Cir. 1973); United States ex rel. Phipps v. Follette, 428 F.2d 912, 914–15 (2d Cir.), cert. denied, 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970). Provitera had met Salley on at least three occasions at the Route 46 Howard Johnson's and on one of the occasions had spent a considerable amount of time—at least half an hour—in the restaurant there with him. Under these circumstances, there was ample evidence to establish an independent basis for Provitera's identification of Salley, and accordingly there was no substantial likelihood of misidentification. Haberstroh v. Montanye, 493 F.2d 483 (2d Cir. 1974); United States v. Counts, 471 F.2d 422, 424–25 (2d Cir.), cert. denied, 411 U.S. 935, 93 S.Ct. 1909, 36 L.Ed.2d 395 (1973).

### IX. *Appellant Salley's denial of the effective assistance of counsel.*

■■■ Salley's claim of having been denied the effective assistance of counsel raises a substantial issue which requires the granting of a new trial. The trial began on January 21, 1974. Salley's first attorney died suddenly on February 5, 1974, during the middle of the trial. A new attorney was appointed the following day and testimony resumed on February 7. Salley's new counsel immediately moved for a continuance until February 11, but his request was denied. Under these circumstances, this being a complex conspiracy case, we hold that

Salley's new attorney had insufficient time to prepare his defense.

 In reaching the conclusion that the attorney's death in the middle of the trial was a ground for severance or continuance as to that defendant, we recognize that it is not an inevitable one, for every case. The record indicates that the Government attempted to provide Salley's new counsel with all of the information generally available to a defense attorney and in addition an effort was made to bring the new attorney up to date on the trial. We are also aware of the fact that although the trial resumed on February 7, no testimony directly implicating Salley was introduced until February 13. And there is something to be said for the Government's suggestion that in a trial such as this, Salley's interests were to a certain degree represented by the attorneys for the other defendants—at least it was in the interests of all the defendants to attack the credibility of Government witnesses.[30] We assume, moreover, that Judge Duffy's decision to deny the continuance must have been influenced by the fact that the trial was certain to be a relatively long one (it turned out to be eight weeks) and the jury had been sequestered. Balancing all of these factors against Salley's right to the effective assistance of counsel, however, we nevertheless conclude that the brief continuance requested by Salley's counsel should have been granted. This is not a case where a defendant has deliberately attempted in bad faith to delay a trial by seeking new counsel. United States v. Maxey, 498 F.2d 474 (2d Cir. 1974). The request, made on a Thursday, February 7, would apparently have resulted in a delay of only two trial days as Salley's counsel said he would be ready for trial on Monday, February 11. In the light of the abundance of materials with which Salley's new attorney had to familiarize himself, we are almost forced to assume that his client was prejudiced by the in-

adequate amount of time that he had to prepare his case. *See* United States v. Mitchell, 354 F.2d 767, 769 (2d Cir. 1966).

 No per se rule can be stated to cover all situations where an attorney's death (or illness) necessitates the appointment of new counsel in the midst of a trial. As the Supreme Court recognized in one of its earliest opinions,

> In questions of this nature [motion for continuance because of the death of an attorney], we must be governed by a sound discretion; in order to prevent, on the one hand, an unnecessary procrastination, and, on the other hand to avoid an injurious precipitation of trial. . . . It is true that counsel might even at this time be employed, so as to admit, perhaps, of an argument before the court rises; but it is reasonable, that in a cause of such magnitude, the counsel should have an opportunity to investigate the principles, and to consider the authorities connected with it, out of term, and unencumbered by the pressure of the current business of the Court.

Hunter v. Fairfax, 3 U.S. (3 Dall.) 305, 305–06, 1 L.Ed. 613 (1796). Here the inability to prepare for trial would have made it difficult for Salley's attorney to disassociate his client from the other defendants, or to discredit Government witnesses (even though they were not initially testifying against Salley directly). We do not say that Salley's defense was so inadequate as to amount to a "mockery of justice," United States v. Wight, 176 F.2d 376, 379 (2d Cir. 1949), cert. denied, 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586 (1950); but faced with the present factual setting, particularly the element of a complex multidefendant trial, we are constrained to find the denial of a continuance to constitute reversible error.

 So saying, we are not articulating a new standard for the length of time necessary for an attorney to pre-

---

**30.** This is not to say that the interests of the defendants were by any means identical. Quite to the contrary, Salley could not be rep-

resented by any of the other attorneys already participating at the trial because of the considerable potential of conflicting interests.

pare a criminal case.[31] Our conclusions are limited to the facts presently before us, and speak only to the situation where a motion for continuance [32] is made because counsel must be replaced in the midst of trial because of death or established illness.

### X. The admissibility of certain testimony concerning appellant Pugliese.

Appellant Pugliese contends that it was error for the trial court to receive into evidence (1) testimony by two Government witnesses that he (Pugliese) had shot coconspirator DiGregorio ("Paulie, the Arrow") in the knee and (2) testimony that he had been sent to jail in October of 1971. Pugliese maintains that this evidence of separate crimes was introduced by the Government solely to show Pugliese as a professional criminal and a man of violence. *See* United States. v. Brettholz, 485 F.2d 483, 487 (2d Cir. 1973). Quite to the contrary, however, all of the evidence in question was related to the conspiracy being tried and of probative value.

■ The incident regarding the shooting of DiGregorio was related by Government witnesses Barnaba and Dawson. Barnaba told the story as it had been related to him by Pugliese. Dawson repeated DiGregorio's statement on the shooting. Both stories indicate that DiGregorio was shot when he failed to pay Pugliese for certain drug purchases—he had been "short with the money." The shooting was thus admissible as evidence of the kind of enforcement techniques that Pugliese was willing to resort to in furtherance of the ends of the conspiracy in question. *See* United States v. Bynum, 485 F.2d at 498–99; United States v. Persico, 425 F.2d 1375,

1384 (2d Cir.), cert. denied, 400 U.S. 869, 91 S.Ct. 102, 27 L.Ed.2d 108 (1970).

■ Likewise admissible was evidence of Pugliese's going to jail in October of 1971. This evidence was introduced only on redirect examination of the witness Barnaba after defense counsel had questioned Barnaba about his introduction by Pugliese to Dilacio and Pannirello. On direct, Barnaba had only said that Pugliese was "going away" and that preparations were being made to run his drug operation while he was absent. Only after defense counsel had ridiculed Barnaba's testimony [33] was the further explanation offered that an introduction of Barnaba to Dilacio and Pannirello was necessary since Barnaba would be doing business with them while Pugliese was in jail. Defense counsel had opened the door for the introduction of this very relevant evidence concerning the operation of this conspiracy.

■ In addition, Pugliese's activities during incarceration were relevant to prove his role in the continuance of the conspiracy charged here. Pugliese's ability to direct and profit from a drug operation even while in jail was probative evidence to show the extent of his power in the entire conspiracy, if not the extent and nature of the conspiracy. *See* United States v. Agueci, 310 F.2d 817, 839 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963).

### XI. The Government's summation.

■ Most of the appellants contend that the summation by the Government was improper. They urge that the United States Attorney brought the prestige and reputation of the government of the United States and his office before the

---

**31.** Nor are we willing to accept appellant's position that a two-week continuance would have been an appropriate length of time for a continuance. United States v. Bentvena, 319 F.2d 916, 934 (2d Cir.), cert. denied, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963).

**32.** On this basis it is unnecessary for us to consider the prejudicial effect of Salley's first counsel's having told the jury in opening argument that he (Salley) would take the stand,

while his second attorney advised him not to do so. We reject, however, the Government's argument that this could not conceivably have been prejudicial.

**33.** Counsel asked Barnaba whether he had been paid money for the introduction and upon receiving the reply "None that I know of" retorted, "So he did it because you were a nice guy, is that right?"

jury in an effort to convince them of the guilt of the appellants. Examples of the allegedly prejudicial behavior included comments by the United States Attorney regarding the esteem he had for his "client," the United States of America, and a statement characterizing his assistants as "your Government's representatives." In addition, the United States Attorney made the following statement:

> But in deciding this case, we would like you to try us, the government. In fact, we urge you to try us. Try us with a careful review of all the facts that are before you; before you in evidence on the record, in pictures, in documents, on tapes. When you do this we submit you will find that the government and its witnesses have been entirely candid and truthful. (Tr. at 5031.)

In the context of the trial and balanced against the tactics of the defense lawyers in this case, we find none of the foregoing statements prejudicial. United States v. Benter, 457 F.2d 1174 (2d Cir.), cert. denied, 409 U.S. 842, 93 S.Ct. 41, 34 L.Ed.2d 82 (1972).

Throughout the trial, the defense lawyers took the position that none of the Government witnesses were credible, and the theme recurs throughout the defense summations that the Government's case was complete fabrication. Tramunti's attorney referred to Stasi's testimony as "bought, paid for and edited." Robinson's counsel said, "I don't blame Mr. Curran . . . for putting on these witnesses. . . . The agents give him a case, and he has to prosecute it. . . . He does the best he can with what he has," but added (as to Dawson), "He doesn't do a day in jail. He made some deal. The man has a license to steal, the man has a license to sell drugs if he pulls the wool over your eyes. . . ." Counsel for Russo said (as to Barnaba), "If he expected the U.S. Attorney to get up on his behalf, he'd better produce in here. And I suggest to you that's what he is doing and did. It's a production, a fabrication." Counsel for Mamone said as to the prosecution: "Do

they have to show tangible acts of wrongdoing on the part of that person, on the part of Mamone? No. We will throw him in. It might stick. It might stick."

The statements by the United States Attorney must thus be viewed as an attempt to offer a rebuttal to the attacks made directly against his witnesses and directly or indirectly against his office. In the main, his statements were confined to a detailed summary of the Government's case with constant reference to the record before the jury. His relatively subdued comments in reply we do not find improper. United States v. DeAngelis, 490 F.2d 1004, 1011 (2d Cir.), cert. denied, 416 U.S. 956, 94 S.Ct. 1970, 40 L.Ed.2d 306 (1974); United States v. LaSorsa, 480 F.2d 522 (2d Cir. 1973).

■ Similarly unconvincing are appellants' claims that the Government made prejudicial remarks concerning the presence of Vincent DiNapoli, one of Joseph DiNapoli's brothers, in the courtroom and his apparent unwillingness to offer testimony to rebut the Government's case. Appellants claim that these remarks were made for the sole purpose of making it appear that the Government witnesses were being subjected to subtle threats or intimidation. To the contrary, it appears that the statement regarding Vincent DiNapoli was to the effect that if the testimony of Government witness Stasi as to the evening with Tramunti at the Tear Drops Bonsoir was false, it could have been disproved by Vincent DiNapoli. His failure to testify was thus properly brought before the jury. See United States v. Dioguardi, 492 F.2d 70, 82 (2d Cir.), cert. denied, 419 U.S. 87, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974).

## XII. *The marshaling of the evidence by the trial court.*

■ Appellant Mamone raises the issue of the manner in which the trial judge summarized the testimony. He contends that the trial judge committed error by failing to give an equal amount of time to both the Government and de-

fense cases in his statement. We reject the argument. Faced with considerable evidence to distill into a statement of facts which would make his charge on the law understandable, Judge Duffy made every effort not to take over the jury's fact finding role. He explicitly reminded them with the standard disclaimer:

These are duties completely within your purview and I will not interfere with your province. And if through some inadvertence I misstate some evidence, as well I might, please, please disregard any such statement by me that does not accord with your recollection of what the evidence was. (Tr. at 5320–22.)

In the light of the broad discretion given to trial judges in summarizing the evidence in a case, United States v. Tourine, 428 F.2d 865 (2d Cir. 1970), cert. denied, 400 U.S. 1020, 91 S.Ct. 581, 27 L.Ed.2d 631 (1971), we find no error in Judge Duffy's marshaling of the facts in this complicated, multiparty conspiracy case.

XIII. *The prior inconsistent statement of Government witness Stasi.*

Stasi, it will be recalled, testified on direct examination that he overheard Inglese tell Tramunti that he (Inglese) was expecting some "goods" and therefore needed money from Tramunti. On cross-examination Stasi was questioned about whether he had heard the word "goods" or the word "something" in the conversation between Tramunti and Inglese, and he was confronted with his own previous statements during police debriefings in which he had used the word "something" rather than the word "goods." On redirect, Stasi was asked why he had made prior inconsistent statements, and he answered that he had been "afraid" of Tramunti. Tramunti's lawyer moved for a mistrial at this point. At the close of the trial, Tramunti's lawyer requested that the judge give a limiting instruction to the jury explaining that Stasi's statement concerning his fear of Tramunti could be con-

sidered only as evidence of the witness's state of mind, not for the truth of the statement itself. His point was, of course, that when, in an effort to explain an earlier refusal to testify or prior inconsistent statements, a witness relates facts (*i. e.,* a threat to his life, a conversation which could be interpreted as being intended to intimidate), the jury should be instructed that such evidence is not to be understood as establishing, for example, that a threat was really made, but should have value only as evidence that the witness believed, rightly or wrongly, that he was in danger, thus explaining his conflicting testimony. United States v. Malizia, *supra,* 503 F.2d at 581; United States v. Cirillo, 468 F.2d 1233 (2d Cir. 1972), cert. denied, 410 U.S. 989, 93 S.Ct. 1501, 36 L.Ed.2d 188 (1973); United States v. Berger, 433 F.2d 680 (2d Cir. 1970), cert. denied, 401 U.S. 962, 91 S.Ct. 970, 28 L.Ed.2d 246 (1971).

But here there was no elaboration by Stasi of the facts which led him to be afraid of Tramunti. The request for a limiting instruction came four weeks after the testimony was received. Even conceding that an instruction should have been given, upon request, at the time, to have refused it later cannot be deemed reversible error, at least where as here there is much to be said for the proposition that the jury could only have understood his statement as going to his state of mind, in any event.

XIV. *Springer's sentence.*

Appellant Springer contends that the sentence imposed upon him was unnecessarily harsh and should be reviewed by this court. Admittedly, the concurrent 15-year terms that were meted out were rigorous, but they were within permissible limits and based on permissible factors, and hence not subject to review. Dorszynski v. United States, 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974).

XV. *Appellants' other claims.*

Appellants' other claims have been considered by this court; however, all

are found to be meritless and none are found to be substantial enough to merit elaboration in this already lengthy opinion.

Judgment affirmed as to Joseph Ceriale, Donato Christiano, Vincent D'Amico, Joseph DiNapoli, John Gamba, Louis Inglese, Angelo Mamone, Frank Pugliese, Warren C. Robinson, Frank Russo, John Springer, Carmine Tramunti and Hattie Ware.

Judgment reversed as to appellant Alonzo.

Judgment reversed and remanded as to appellant Salley.

All motions for remand denied.